**In re AIR DISASTER AT LOCKERBIE, SCOTLAND ON DECEMBER 21, 1988.**

**Denice H. REIN, et al., Plaintiffs–Appellants,**

v.

**PAN AMERICAN WORLD AIRWAYS INCORPORATED, Defendant–Appellee.**

**In re HIJACKING OF PAN AMERICAN WORLD AIRWAYS, INC. AIRCRAFT at KARACHI INTERNATIONAL AIRPORT, PAKISTAN on SEPTEMBER 5, 1986.**

**Dilip JOSHI, Nadya Hussain, Tahra Lodhi, Dilip Parikh, Faraidoon Oshtory, et al., Plaintiffs–Appellees,**

v.

**PAN AMERICAN WORLD AIRWAYS, INC., Defendant–Appellant.**

**Nos. 269, 460, Dockets 90–7388, 90–7636.**

United States Court of Appeals, Second Circuit.

Argued Oct. 1, 1990.

Decided March 22, 1991.

Lee S. Kreindler, Chairman, Plaintiffs' Committee (Steven R. Pounian, James P. Kreindler, Michael F. Baumeister, Richard E. Brown, Stanley M. Chesley, Nicholas Gilman, Frank H. Granito, Jr., Kreindler & Kreindler, New York City, of counsel), for plaintiffs-appellants in No. 269.

Richard M. Sharp, Washington, D.C. (Frederick C. Schafrick, Elizabeth M. Brown, Shea & Gardner, Washington, D.C., James M. Shaughnessy, Windels, Marx, Davies & Ives, Condon & Forsyth, New York City, of counsel), for defendant appellee in No. 269.

James E. Landry, George S. Lapham, Jr., David A. Berg, Air Transport Ass'n of

America, Washington, D.C., filed a brief amicus curiae in No. 269.

Lee S. Kreindler, Chairman, Plaintiffs' Committee, Lockerbie Disaster (Steven R. Pounian, James P. Kreindler, Michael F. Baumeister, Richard E. Brown, Stanley M. Chesley, Nicholas Gilman, Frank H. Granito, Jr., Kreindler & Kreindler, of counsel; Marc S. Moller, Lead Counsel, Plaintiffs' Steering Committee, Karachi Hijacking, Daniel C. Cathcart, Wm. Marshall Morgan, Kreindler & Kreindler, New York City, of counsel), for plaintiffs-appellees in No. 460.

Richard M. Sharp, Washington, D.C. (Frederick C. Schafrick, Elizabeth M. Brown, Shea & Gardner, Washington, D.C., James M. Shaughnessy, Windels, Marx, Davies & Ives, New York City, of counsel), for defendant-appellant in No. 460.

Before CARDAMONE and MINER, Circuit Judges and POLLACK, District Judge.*

CARDAMONE, Circuit Judge:

A single question of law is raised on appeals from two district court orders: one involves the crash of Flight 103 over Lockerbie, Scotland; the other a hijacking in Karachi, Pakistan.

The Lockerbie case arose from the terrorist bombing of Pan Am Flight 103 from London to New York on December 21, 1988. The surviving relatives and personal representatives of those who died sued Pan American World Airways, Inc. (Pan Am), two Pan Am subsidiary corporations that provided security services, and Pan Am's parent corporation. All actions were consolidated in the Eastern District of New York by order of the Judicial Panel on Multidistrict Litigation. On June 2, 1989

Pan Am moved for partial summary judgment on the punitive damages claims, asserting they were barred by the Warsaw Convention.[1] For purposes of Pan Am's motion, the district court presumed that the carrier committed willful misconduct, and that the applicable local law permitted the recovery of punitive damages. On January 3, 1990 the Chief Judge of the Eastern District (Platt, C.J.) granted partial summary judgment and dismissed the punitive damages claims. 733 F.Supp. 547. On February 26, 1990 Chief Judge Platt entered a second memorandum and order denying plaintiffs' motion for reargument, but granting certification under 28 U.S.C. § 1292(b) for immediate appeal of the case to this Court as one involving a controlling question of law. 736 F.Supp. 18.

The Karachi case arose from a terrorist hijacking of Pan Am Flight 73 from Bombay, India, to New York, stopping at Karachi and Frankfurt on September 6, 1986. The surviving relatives and personal representatives of those killed sued Pan Am, and the actions were consolidated in the Southern District of New York by order of the Judicial Panel on Multidistrict Litigation. The district court (Sprizzo, J.) denied Pan Am's motion for partial summary judgment on the issue of whether Pan Am had committed willful misconduct, as well as Pan Am's later motion for partial summary judgment seeking to dismiss plaintiffs' claims for punitive damages. 729 F.Supp. 17.

None of the parties dispute that these cases are governed by the Warsaw Convention and by the Montreal Accord.[2] The issue presented is independent of any factual situation. We must decide whether a plaintiff may state a claim for punitive

---

* Honorable Milton Pollack, United States District Court for the Southern District of New York, sitting by designation.

1. Convention for the Unification of Certain Rules Relating to International Transportation by Air, *done* at Warsaw, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11, *reprinted at* 49 U.S.C. app. § 1502 note, Warsaw Convention (1988).

2. Agreement Relating to Liability Limitations of the Warsaw Convention and Hague Protocol,

Agreement CAB 18900, Approved by Executive Order E–23680, May 13, 1966 (Docket 17325) (1966), reprinted in Civil Aeronautics Board, Aeronautical Statutes and Related Material 515–16 (1974) (Montreal Agreement). The Montreal Agreement raised the amounts recoverable under the Warsaw Convention and its Protocols for passengers on international flights with departure or destination points in the United States to $75,000.

damages in a wrongful death action governed by the Warsaw Convention, assuming the carrier committed willful misconduct. Although the Convention is silent on this subject and the lack of legislative materials addressing the issue makes interpreting the Convention's effect on punitive damages claims difficult, we are persuaded that the purposes for which the Convention was created are not consistent with an award of punitive damages. Thus, we hold that these plaintiffs may not recover such damages.

So much has been written concerning the Convention since its adoption over 50 years ago that we must take care not to get lost in a wilderness of words. To that end we think it helpful to set forth the analytical framework for the discussion that follows. We discuss first the Convention's purposes, structure and history. (I). Then, in order to clearly identify what the term "punitive damages" means in the context of our consideration of the Convention, we focus analysis by exploring initially the role of punitive damages in American law generally, examining the nature of the recovery permitted under state and federal law; and, after that, by deciding whether the Convention provides an exclusive cause of action or whether it permits separate state law actions claiming punitive damages. (II). We conclude that the Convention preempts state causes of action because differences in the various state laws—some of which view punitive damages as penal in nature, some compensatory, and some both—would introduce such great confusion into this subject as to destroy any hope of uniformity in applying the Convention. The Convention therefore bars state wrongful death actions in cases arising under it. (III).

We next hold that because air carrier liability is a uniquely international problem requiring uniform interpretation, the Convention must be interpreted according to federal common law. We adopt the federal common law of torts to construe the Convention and determine that federal common law does not contemplate a compensatory element in a punitive damages claim. (IV). Having identified the governing law and

the nature of punitive damages potentially available under that law, we turn to the Convention to see whether it allows for the kind of punitive damages available to plaintiffs under federal law. Our analysis of the Convention reveals that Article 17 did not contemplate air carrier liability for that type of punitive damages; Article 24 does not preserve such liability under local law; and the Convention does not permit the sort of punitive damages available under federal law to be awarded, even when the liability limitations are lifted under Article 25 in cases of willful misconduct. (V). Finally, we believe policy considerations that led the various contracting parties to adhere to the Warsaw Convention strongly militate against recognition of punitive damages. (VI).

## I  PURPOSES, STRUCTURE AND HISTORY OF THE WARSAW CONVENTION

The Warsaw Convention was drafted when the airline industry was in its infancy. It was the product of two international conferences—the first held in Paris in 1925 and the second in Warsaw in 1929—and four years of work by the interim Comité International Technique d'Experts Juridique Aériens (CITEJA) formed at the Paris Conference. The Convention had two primary goals: first, to establish uniformity in the aviation industry with regard to "the procedure for dealing with claims arising out of international transportation and the substantive law applicable to such claims," as well as with regard to documentation such as tickets and waybills; second—clearly the overriding purpose—to limit air carriers' potential liability in the event of accidents. Lowenfeld & Mendelsohn, *The United States and the Warsaw Convention*, 80 Harv.L.Rev. 497, 498–99 (1967) (Lowenfeld & Mendelsohn); *Block v. Compagnie Nat'l Air France*, 386 F.2d 323, 327 (5th Cir.1967), *cert. denied*, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968).

The liability limit was believed necessary to allow airlines to raise the capital needed to expand operations and to provide a defi-

nite basis upon which their insurance rates could be calculated. Lowenfeld & Mendelsohn, at 499–500; H. Drion, *Limitation of Liabilities in International Air Law* 16 (1954) (Drion, *Limitation of Liabilities*); *Floyd v. Eastern Airlines, Inc.*, 872 F.2d 1462, 1467 (11th Cir.1989), *cert. granted*, — U.S. —, 110 S.Ct. 2585, 110 L.Ed.2d 266 (1990). The nations drafting this provision had a direct interest in establishing liability limits since nearly all existing airlines were either owned or heavily subsidized by the various contracting states. The drafters also believed that a liability limit would lessen litigation. Sen. Comm. on For. Relations, *Message from the President of the United States Transmitting a Convention for the Unification of Certain Rules*, Sen.Exec.Doc. No. G, 73d Cong., 2d Sess. 3–4 (1934) (Secretary of State Cordell Hull).

To effect these purposes, the Convention adopted a trade-off between carriers and their passengers: passengers would have the absolute right to compensation for injuries up to 125,000 Poincare francs, (Articles 17, 22(1)), unless the carrier could prove it had taken all necessary measures to avoid the damages (Article 20(1)). Passengers could claim no damages above the 125,000 franc limit unless they demonstrated that the carrier had engaged in willful misconduct, in which case the Convention's limits on carrier liability would be lifted (Article 25). While later agreements such as the 1966 Montreal Accord somewhat modified this scheme, so that in some cases the liability limit is higher and the carrier may no longer raise the defense that it took all necessary measures, *see* Lowenfeld & Mendelsohn at 596–600, the basic structure of the Convention remained the same.

The Convention entered into force in February, 1933 and by the end of that year most European nations were members. Although the United States had not participated in the work of CITEJA and only sent an observer to Warsaw, it moved quickly thereafter, depositing its instrument of adherence on July 31, 1934. President Roosevelt proclaimed the Treaty 90 days later. Lowenfeld & Mendelsohn, at 501–02.

The nature of the Convention can be identified to some extent from the fact that the Convention's structure clearly derives from the civil law of contracts. Calkins, *The Cause of Action Under the Warsaw Convention*, 26 J. Air L. & Com. 217, 223 (1959) (Calkins, *The Cause of Action*). The liability regime established by the Convention is very similar to the French law of contractual liability for domestic carriers. G. Miller, *Liability in International Air Transport* 234 (1977). For example, the French law of contract implies a *"stipulation pour autrui"* in contracts of carriage, allowing a decedent's relatives to bring an action in damages against the carrier without having to prove the carrier's negligence, but subjecting the plaintiffs to any limitation or exclusion clauses contained in the contract. *Id.* at 236–37; A. Lowenfeld, *Aviation Law* § 1.52, at 7–17. German law is similar. *Id.* § 1.53, at 7–21 to –23.

Article 25 of the Convention, which lifts the liability limitation in cases of willful misconduct, also derives from the basic civil law principle that "[n]o one can escape the consequences of one's *dol,* or intentional fault." Miller, *Liability in International Air Transport* at 73. This principle was often "extended to cases of gross negligence *(faute lourde)*," *id.,* and the Convention deliberately allows common law countries to subject air carriers to unlimited liability in cases of willful misconduct. *Id.* at 80. Before turning to the text of the Convention, we direct our attention to the role of punitive damages in American law in order to identify clearly what kinds of damages the Warsaw Convention might bar.

## II PUNITIVE DAMAGES IN AMERICAN LAW

The parties in the suits before us contend that punitive damages are everything from damages meant to compensate certain types of injuries to damages meant purely to punish the tortfeasor. To explore fully the nature of the recovery permitted under state and federal law, we must keep in mind that punitive damages derive their

meaning depending on whether federal law or a given state law, such as Massachusetts, New Hampshire or Connecticut, governs. Here the plaintiffs in each case have asserted both federal and state law causes of action.

Punitive damages have historically played a role in the American common law of tort. *See Smith v. Wade*, 461 U.S. 30, 35 & n. 3, 103 S.Ct. 1625, 1629 & n. 3, 75 L.Ed.2d 632 (1983); Belli, *Punitive Damages: Their History, Their Use and Their Worth in Present–Day Society*, 49 UMKC L.Rev. 1 (1980) (Belli, *Punitive Damages* ). In the early case of *Day v. Woodworth*, 54 U.S. (13 How.) 363, 14 L.Ed. 181 (1851), the Supreme Court recognized the existence and propriety of punitive damages, noting that it could "inflict what are called exemplary, punitive, or vindictive damages upon a defendant, having in view the enormity of his offence rather than the measure of compensation to the plaintiff." *Id.* at 370–71. Punitive damages have had a hazy history—sometimes used to punish, and sometimes used to compensate a plaintiff for injuries to pride, dignity, or reputation that would not otherwise be compensated through traditional tort awards intended to make a plaintiff whole. Today the Supreme Court views punitive damages as penal rather than compensatory. *See Browning–Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 109 S.Ct. 2909, 2932, 106 L.Ed.2d 219 (1989) (O'Connor, J., concurring, in part, and dissenting, in part) (citing numerous Supreme Court cases recognizing the penal nature of punitive damages). It has characterized these damages as private fines used to punish a defendant's reprehensible conduct and to deter its repetition. *See International Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 48, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979).

Lower federal courts and a majority of state courts have also held that punitive damages are penal, rather than compensatory, in nature. *See Floyd*, 872 F.2d at 1486 ("Punitive damages are intended to penalize the wrongdoer in order to benefit society"); *Harpalani v. Air–India, Inc.*, 634 F.Supp. 797, 799 (N.D.Ill.1986) (purpose

of punitive damages is to punish and deter); *Andor v. United Air Lines, Inc.*, 303 Or. 505, 511–13, 739 P.2d 18, 22–23 (Or.1987) (aim of punitive damages is punishment, deterrence of defendant and others from engaging in tortious conduct, and vindication of social norms). *See also*, Restatement (Second) of Torts § 908 (punitive damages are "damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future"); Kenney, *Punitive Damages in Aviation Cases: Solving the Insurance Coverage Dilemma*, 48 J. Air L. & Com. 753, 755 (1983).

A minority of state courts view punitive damages as serving a compensatory function. *See Peisner v. Detroit Free Press*, 68 Mich.App. 360, 242 N.W.2d 775, 780 (1976) (purpose of punitive damages not to punish defendants but "to fully compensate the plaintiffs for the injury suffered by them because of the defendants' actions"); *Kelsey v. Conn. State Employees Ass'n.*, 179 Conn. 606, 427 A.2d 420, 425 (1980); *Bixby v. Dunlap*, 56 N.H. 456 (N.H.1876); *Eshelman v. Rawalt*, 298 Ill. 192, 131 N.E. 675, 677–78 (1921); Belli, *Punitive Damages*, at 6. These damages are either given "on the theory that the injury is greater, and the actual damages are increased, by reason of the aggravating circumstances" of the tort or to compensate the plaintiff for litigation costs. 22 Am.Jur.2d *Damages* § 735 (1988). This view of punitive damages existed in New Hampshire and Michigan when the United States first adhered to the Warsaw Convention in 1934.

In some states, "exemplary damages may properly partake of both a punitive and a compensatory character." *Id.* § 733; C. McCormick, *Damages*, § 78, at 279 (1935). We noted, for example, in *Racich v. Celotex Corp.*, 887 F.2d 393, 397 (2d Cir.1989), that New York has viewed punitive damages "as having a purpose beyond punishment, 'afford[ing] the injured party a personal monetary recovery over and above compensatory loss.' " *Id., citing*

*Wittman v. Gilson,* 70 N.Y.2d 970, 972, 525 N.Y.S.2d 795, 520 N.E.2d 514 (1988).

## III PREEMPTION OF STATE LAW CAUSES OF ACTION

It follows from the preceding discussion that were we to hold that plaintiffs could bring state law causes of action, then such a cause of action for punitive damages would sometimes include a compensatory element. On the other hand, if the federal cause of action is exclusive, then we would look to federal law to decide whether that body of law—which generally recognizes no compensatory element in punitive damages claims—would allow such a claim.

### A. *Current Second Circuit Law*

We have left open the question of whether state causes of action are still available under the Convention. As the law in this Circuit now stands, we have ruled that the Warsaw Convention creates a cause of action enabling a plaintiff to sue directly under its terms. *See Benjamins v. British European Airways,* 572 F.2d 913, 919 (2d Cir.1978), *cert. denied,* 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979). This holding reversed prior cases that had held the Convention created only a presumption of liability, not a cause of action. *See Komlos v. Compagnie Nationale Aire France,* 209 F.2d 436 (2d Cir.1953), *cert. denied,* 348 U.S. 820, 75 S.Ct. 31, 99 L.Ed. 646 (1954); *Noel v. Linea Aeropostal Venezolana,* 247 F.2d 677 (2d Cir.), *cert. denied,* 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957).

*Benjamins* left open the question of whether state causes of action were still available under the Convention, and only two of our cases have touched on this subject. *See In re Air Crash Disaster at Warsaw, Poland, on March 14, 1980,* 705 F.2d 85 (2d Cir.) (affirming on other grounds district court decision that regarded the cause of action under the Convention as exclusive, without discussing exclusivity issue), *cert. denied,* 464 U.S. 845, 104 S.Ct. 147, 78 L.Ed.2d 138 (1983); *cf. Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.,* 617 F.2d 936, 941–42 (2d Cir.1980) (postulating in dicta that action

under the Convention might not be exclusive). The Supreme Court has declined to address the question of exclusivity. *See Air France v. Saks,* 470 U.S. 392, 408, 105 S.Ct. 1338, 1346, 84 L.Ed.2d 289 (1985). We consider the issue an open question.

### B. *Preservation and Preemption*

■ The issue is not whether the Convention preempts state laws with which it is in direct conflict, as it obviously must under the Supremacy Clause of the United States Constitution. *See* U.S. Const. art. VI. Nor is it whether a plaintiff may bring a state cause of action when the claim does not arise under the Warsaw Convention, which a plaintiff plainly may institute. *See Abramson v. Japan Airlines Co.,* 739 F.2d 130, 134 (3d Cir.1984), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985); *Tokio Marine,* 617 F.2d at 941–42. Instead, the question we must decide is whether state causes of action are preempted when the state claim alleged falls within the scope of the Convention. The answer to the question we believe is "yes", for several reasons.

To begin with, although neither the Convention itself nor any Congressional action at the time the United States adhered to the Convention expressly preempted state law, *Boehringer–Mannheim Diagnostics, Inc. v. Pan American World Airways, Inc.,* 737 F.2d 456, 459 (5th Cir.1984), *cert. denied,* 469 U.S. 1186, 105 S.Ct. 951, 83 L.Ed.2d 959 (1985), various authorities support our conclusion that the Convention itself does not expressly preserve state law causes of action either.

The question of whether the Convention provides the exclusive liability remedy for international air carriers by providing an independent cause of action, or whether state law causes of action are preserved under the Convention has been addressed by several courts. In *Boehringer–Mannheim,* the Fifth Circuit held the Convention cause of action is exclusive. *Id.* at 458. Without in-depth analysis, the court ruled that Texas law was preempted, pointing out that an "obvious major purpose of the Warsaw Convention was to secure uniform-

ity of liability for air carriers," and that uniformity has national as well as international application. *Id.* at 459. The Ninth Circuit has also rebutted the idea that a cause of action may be founded on some law other than the Convention, stating: "Such causes of action might, consistently with the Convention, provide varying measures of damages or varying specifications of persons entitled to recover." *In re Mexico City Aircrash of October 31, 1979,* 708 F.2d 400, 414 n. 25 (9th Cir.1983).

Other contracting parties have also concluded that the Convention cause of action is exclusive. French courts, for example, have so decided. *See* Miller, *Liability in International Air Transport* at 237 (French court held plaintiffs could not avoid liability limits by renouncing contractual rights and suing under a negligence theory). In addition, England, Canada, and Australia have all enacted implementing statutes that make an Article 17 action the exclusive remedy for claims governed by the Convention. Carriage by Air Act, 1932, 22 & 23 Geo. 5, ch. 36, § 1(4) (England); Civil Aviation (Carrier's Liability) Act, 1959–1973, § 12(2), 2 Austl. Acts P. 643, 645 (1974) (Australia); Carriage by Air Act, § 2(5), Can.Rev.Stat., ch. C–26 (1979) (Canada).

It is significant that Australia and Canada are federal states, though Canada has "an essentially unified judicial system," but that these Acts have eliminated the choice of law problems with which American courts have struggled. Miller, *Liability in International Air Transport* at 228–31. Further, other countries' interpretations of the Convention are "entitled to considerable weight" by this Court. *See Benjamins,* 572 F.2d at 919; *see also Chan v. Korean Airlines, Ltd.,* 490 U.S. 122, 109 S.Ct. 1676, 1683, 104 L.Ed.2d 113 (1989); *Saks,* 470 U.S. at 396–97, 105 S.Ct. at 1340–41; *Reed v. Wiser,* 555 F.2d 1079, 1083 (2d Cir.), *cert. denied,* 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977).

Plaintiffs argue that, by use of such phrases as "the law of the court to which the case is submitted," Article 25 (limitations of liability lifted in cases of willful misconduct); *see* Article 21 (contributory negligence), Article 22 (periodic payments), Article 28 (procedural questions), and Article 29 (calculation of statute of limitations), the Convention left certain matters such as the elements of damages to local law, by which the plaintiffs mean state law. Without delving too deeply into the Convention at this point, we see no reason to believe that the drafters meant to denote the laws of *subdivisions* within nations. *See Mertens v. Flying Tiger Line, Inc.,* 341 F.2d 851, 855 (2d Cir.) ("The basic unit of international law is the nation-state and it is fair to assume, absent clear indications to the contrary, that [the Convention] was written with reference to nation-states, not to areas and subdivisions of nation-states."), *cert. denied,* 382 U.S. 816, 86 S.Ct. 38, 15 L.Ed.2d 64 (1965). As Professor Miller points out, our "highly complex structure of political and judicial jurisdictions ... is specific to the United States." Miller, *Liability in International Air Transport* at 232. The fact that Australia and Canada, the two nations whose law is closest to our own, have applied a single substantive law to actions under the Convention supports our view that the Convention does not preserve any state law causes of action.

We therefore decline to read into the Convention any attempt to preserve a right to a state law cause of action in addition to the action provided under the Convention itself. The way the other parties have viewed the Convention, its emphasis on uniformity, and the need for a single, unified rule on such points as the recoverability of punitive damages lead to the belief that the Convention should be interpreted as making all actions—other than those not based on the Convention—exclusive under it.

■ The next question to be answered is whether, if such state law causes of action are not *preserved* by the Convention, they are in fact *preempted* by the Convention. The Supreme Court has set forth several routes by which state law may be preempted. Congress may, of course, expressly preempt state law, or it may enact a scheme of federal legislation so pervasive that a court may infer Congress left no

room for the states to legislate in the area. *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299–300, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). It may also preempt state law when the subject matter demands uniformity vital to national interests such that allowing state regulation "would create potential frustration of national purposes." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959); *see Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 144, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963). It is under this latter doctrine that we deduce the Convention preempts state law causes of action.

The principal purposes that brought the Convention into being and presumably caused the United States to adhere to it were a desire for uniformity in the laws governing carrier liability and a need for certainty in the application of those laws. *See Reed*, 555 F.2d at 1090; Sen.Exec.Doc. No. G, 73d Cong.2d Sess. 3–4 (1934) (Comments of Secretary of State Hull), *supra.* Hence, the test to be applied is whether these goals of uniformity and certainty are frustrated by the availability of state causes of action for death and injuries suffered by passengers on international flights. We do not see how the existence of state law causes of action could fail to frustrate these purposes.

C. *Implications of Allowing State Law Causes of Action*

■ Any attempt to construe the meaning of punitive damages under the laws of various states may easily become mired down in a morass of conflicting rules. As an illustration, it is settled law that when a plaintiff brings a state wrongful death claim based on diversity jurisdiction, a federal court must apply the choice of law rules of the district in which the court sits, and then the substantive law of the applicable state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477

(1941). An assertion of diversity jurisdiction could result in the inconsistent application of law to the claims before us. Assume the Convention barred punitive damages meant to punish the defendant, but not those meant to compensate the plaintiff for the additional injury stemming from the senselessness of the accident. If a plaintiff were allowed to bring a state law cause of action, the trial court's choice of law analysis might compel it to apply the law of a state holding the minority view of punitive damages so as to include a compensatory element. In such event, the compensatory element in the punitive damage claim might not be allowed in a case choosing the law of another state. In fact, it is quite conceivable that a trial court would be forced to apply differing law from several states to various plaintiffs.

Further, neither the choice of law rules nor the substantive law itself could be predicted with any certainty. An airline's liability could therefore vary widely depending on where the plaintiff resided or chose to sue—under Article 28 a suit may be brought in a court where the carrier is domiciled or has a principal place of business, or where the carrier has a place of business through which the contract was made or before a court at the place of destination.

Additionally, the existence of state law causes of action would make the application of law to the federal cause of action created by the Convention even more complex. If the Convention did not bar a compensatory element in a punitive damages claim under state law, then in those cases involving federal claims as well as diversity claims entailing the minority view of punitive damages, the federal law would differ from the state law, within the same case in federal court. This would present the further problem of whether the trial court should allow a plaintiff to choose between state and federal causes of action. *Cf. Rhymes v. Arrow Air, Inc.*, 636 F.Supp. 737, 741–42 (S.D.Fla.1986) (when plaintiff had option to plead Warsaw Convention cause of action but pleaded only state cause of action in state court, defendants

could not remove action to federal court by raising the Warsaw Convention as a defense); *Trinh v. Citibank, N.A.*, 623 F.Supp. 1526, 1530 (E.D.Mich.1985) (suggesting that a court having both types of jurisdiction should apply the forum state's choice of law rules, thereby treating the case as one arising under diversity jurisdiction), *aff'd* 850 F.2d 1164 (6th Cir.1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 2602, 110 L.Ed.2d 282 (1990); *In re Korean Air Lines Disaster of Sept. 1, 1983,* 704 F.Supp. 1135, 1154–55 (D.D.C.1988) (attempting to decide whether jury trial right given to plaintiffs who had pled a cause of action under the Convention should also be afforded to other plaintiffs who had failed to plead the Convention cause of action).

There is also the possibility that state-owned airlines would be subject to different laws than private airlines—federal courts no longer have diversity jurisdiction over foreign states (many of which own airlines) as defendants—because the Foreign Sovereign Immunities Act is now the sole source of federal jurisdiction in those circumstances. *See Ruggiero v. Compania Peruana de Vapores,* 639 F.2d 872, 873–78 (2d Cir.1981). Even under those circumstances, the state of choice of law analysis is currently not uniform. *Compare Barkanic v. General Admin. of Civil Aviation of the People's Republic of China,* 923 F.2d 957, 959–61 (2d Cir.1991) (holding that federal court must use forum state choice of law rules under the Foreign Sovereign Immunities Act) *with Harris v. Polskie Linie Lotnicze,* 820 F.2d 1000, 1002–03 (9th Cir.1987) (holding that federal courts should use federal common law choice of law rules under the Foreign Sovereign Immunities Act).

Of course, we might solve the general choice of law problem presented by the Convention by adopting state law as federal law and limiting federal law to the choice of law issue. *See, e.g., Corporacion Venezolana de Fomento v. Vintero Sales,* 629 F.2d 786, 793 (2d Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112 (2d Cir. 1984). In that case, there would be consist-

ency between the law applicable to the federal cause of action and the law applicable to the state cause of action. Nonetheless, the law would still vary between states and would also vary from one federal court to another, so that even federal law would not be constant. Moreover, differences might still creep in between the state and federal causes of action in the same federal court because the federal choice of law analysis might well differ from the state choice of law analysis. *See, e.g., Harris,* 820 F.2d at 1004 & n. 5 (applying federal common law choice of law rules to claim under the Foreign Sovereign Immunities Act, with result different from result under California choice of law rules).

In sum, the existence of the state causes of action would not only result in the inconsistent application of law to the same accident, but also would cause enormous confusion for airlines in predicting the law upon which they would be called to respond. It would sink federal courts into a Syrtis bog where they would not know whether they were at sea or on good, dry land, *see* J. Milton, *Paradise Lost,* Book II, *reprinted in* 4 Harvard Classics, *The Complete Poems of John Milton* at 134 (1909), when deciding what law a plaintiff can rely upon, what law the court itself should apply, and why. The problem might not seem especially grave if one looks solely to the orderliness already inherent in the Convention's presumption of airline liability and the $75,000 limit on individual recovery. But this surface unity ignores both the lurking legal chaos and the huge expenditure of time and expense in litigation over the choice of law, which would be inevitable if conflicting laws from various states were available in cases of willful misconduct.

## D. *Other Case Law*

Although decisional law is divided on whether the Warsaw Convention permits a plaintiff to bring a state law claim otherwise governed by the Convention seeking punitive damages, the more reasoned opinions conclude as we do that such claims are barred by the Convention. In *Harpalani,* 634 F.Supp. at 799, the District Court for

the Northern District of Illinois held that allowing punitive damage awards would be inconsistent with the Convention's scheme of keeping compensation at a sufficiently low level to allow carriers to insure against losses, "both because carriers cannot insure against such awards, and because the purpose of punitive damages—to punish and deter ... is unrelated to the signatories' goal of ensuring minimally adequate compensation." *Id.*, *disapproved of on other grounds in Wolgel v. Mexicana Airlines*, 821 F.2d 442, 445 (7th Cir.), *cert. denied*, 484 U.S. 927, 108 S.Ct. 291, 98 L.Ed.2d 251 (1987).

Other courts have found this argument persuasive. In *Floyd*, the Eleventh Circuit squarely held that allowing punitive damages in an action based on state law would "conflict with the scheme of liability provided for in the Warsaw Convention." 872 F.2d at 1485. *Floyd* noted that the entire tone of the Convention appears to be compensatory, not punitive. *Id.* at 1487. It rejected the argument that Article 25 itself created an action for punitive damages, *id.* at 1483–84, and held that the Convention was meant to compensate injured passengers, not to punish airlines. *Id.* at 1486. Therefore, though the court expressly declined to address whether the Convention creates an exclusive cause of action, it held that the plaintiffs could not recover punitive damages on their state law claims even if they could prove willful misconduct. *Id.* at 1486–89.

*In re Air Crash Disaster at Gander, Newfoundland on Dec. 12, 1985*, 684 F.Supp. 927 (W.D.Ky.1987), reached the same conclusion. It held that "state law claims for punitive damages are pre-empted by the Convention to the extent that they would prevent the application of the Convention's limitations." *Id.* at 932–33. *Cf. In re Aircrash in Bali, Indonesia on April 22, 1974*, 684 F.2d 1301, 1308 (9th Cir.1982) ("California law is preempted by the Warsaw Convention to the extent that California law would prevent the application of the Convention's limitation on liability").

Only two cases support the argument that punitive damages do not conflict with the Convention's purposes: *Hill v. United Airlines*, 550 F.Supp. 1048, 1054–56 (D.Kan.1982); *In re Korean Airlines Disaster*, MDL 565 (D.D.C.1989), *appeal docketed*, No. 89–5415 (D.C.Cir. Nov. 3, 1989). *Hill* stated only that the plaintiffs in that case had properly invoked the willful misconduct provision, which if proved "might entitle plaintiffs to recover actual and punitive damages," 550 F.Supp. at 1056, but this holding was not supported by any detailed reasoning. The presiding judge affirmed the jury award of punitive damages in *In re Korean Airlines Disaster* without opinion. *See* Buono, *The Recoverability of Punitive Damages Under the Warsaw Convention in Cases of Willful Misconduct: Is the Sky the Limit?*, 13 Fordham L.J. 570 (1990). Thus, those courts that have carefully analyzed whether punitive damages are recoverable under state law claims arising under the Convention have decided they are not recoverable.

### E. *Analogous Supreme Court Case*

Although not precisely on point, *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978), is analogous to the issue before us. In that case, Title II of the Ports and Waterways Safety Act of 1972 authorized the Secretary of the Department of Transportation to issue regulations respecting the design, construction and operation of oil tankers, in order to ensure minimum standards of vessel safety and the protection of the marine environment. *Id.* at 161, 98 S.Ct. at 996. The Secretary was required to inspect vessels and to issue certificates of compliance allowing the ship to carry the relevant cargo. *Id.* at 162–63, 98 S.Ct. at 996–97. *Ray* read this statutory pattern as embodying Congress' aim to impose uniform national standards for the design and construction of oil tankers. *Id.* at 163–64, 98 S.Ct. at 997. Among other things, the Court noted that Congress planned to have a uniform set of rules in an area that had traditionally been one in which international—rather than national—action was preferable because of the international nature of the problem of

marine pollution. *Id.* at 166, 98 S.Ct. at 999. It also noted that Congress included a provision requiring the Secretary to transmit his proposed rules to appropriate international forums "for consideration as international standards" and that several other requirements of the Act indicated that "Congress expressed a preference for international action." *Id.* at 167, 98 S.Ct. at 999. The Supreme Court ruled therefore that the Act

> leaves no room for the States to impose different or stricter design requirements than those which Congress has enacted with the hope of having them internationally adopted or has accepted as the result of international accord. A state law in this area ... would frustrate the congressional desire of achieving uniform, international standards and is thus at odds with 'the object sought to be obtained by [Title II] and the character of obligations imposed by it....'

*Id.* at 168, 98 S.Ct. at 999–1000 (*quoting Rice,* 331 U.S. at 230, 67 S.Ct. at 1152).

Similarly, by adhering to the Convention, Congress expressed a preference for uniform, international rules. The Convention also operates in an area in which such rules are required due to the international nature of the problem of carrier liability. State statutes governing wrongful death actions differ significantly as to the elements, measure, and distribution of damages. *See* 1 S. Speiser, *Recovery for Wrongful Death* § 1.9 at 29 (2d ed. 1975). The existence of differing laws in various states—particularly respecting punitive damages—would frustrate the Convention's aims of uniformity and certainty in the application of those international rules.

In sum, allowing each of the individual states to prescribe the elements of damage claims governed by the Convention would, as discussed above, "create potential frustration of national purposes." *San Diego Building Trades Council,* 359 U.S. at 244, 79 S.Ct. at 779. We recognize there is a general presumption against finding preemption of state law, *see Motor Vehicle Mfrs. Ass'n of United States, Inc. v. Abrams,* 899 F.2d 1315, 1319 (2d Cir.1990),

but the existence of separate state causes of action conflicts so strongly with the uniform enforcement of the Treaty that in our view that presumption is overcome.

## IV  FEDERAL COMMON LAW

### A.  *Adopting Federal Common Law*

■ Because the Warsaw Convention preempts state law causes of action arising under it, we must next determine what law must be applied in deciding the claims before us. We look to the source of the right in order to determine the controlling law. *See Van Gemert v. Boeing Co.,* 553 F.2d 812, 813 (2d Cir.1977). The source of the right to sue under the Convention is the Convention itself—a treaty that only the federal government has the power to make. U.S. Const. art. II, § 2, cl. 2; art. I, § 10, cl. 1.

Consequently, the source of the right is federal law—in fact, *uniquely* federal law. It follows then the substantive law we must apply is also federal law. *See Clearfield Trust Co. v. United States,* 318 U.S. 363, 366–67, 63 S.Ct. 573, 574–75, 87 L.Ed. 838 (1943); *Vintero Sales Corp.,* 629 F.2d at 795; *cf. DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1201 n. 12 (3d Cir.1978) (noting that after *Benjamins,* when a plaintiff asserts a cause of action based on the Convention itself, "a federal court, not sitting in diversity, would not be bound by state substantive law and would be free to fashion" applicable rules of law "under federal law principles").

Two choices are generally available to a court in deciding the law created by a federal cause of action: adopting state law or creating a uniform federal common law. It would make little sense to adopt state law when uniform interpretation of the federal law is more consistent with the Convention's purposes. *Clearfield Trust* states that one of the primary considerations in determining whether federal courts should fashion federal law or merely adopt state law is the degree of need for national uniformity. *Clearfield Trust,* 318 U.S. at 367, 63 S.Ct. at 575. Since, as a treaty, the Warsaw Convention is the Supreme Law of the Land, U.S. Const. art. VI, cl. 2, this

federally-created cause of action should be construed exclusively under federal law. *See Block,* 386 F.2d at 337–38 (Convention is like a "uniform law" within the United States and court "has an obligation to keep interpretation as uniform as possible").

Other circuits agree. In *In re Mexico City,* 708 F.2d 400, the Ninth Circuit recognized the Convention's federally created cause of action and held "the questions of who are the persons entitled to assert that cause of action and what are their respective rights may be determined by reference to other federal statutes." *Id.* at 415. It left the task of determining the "most appropriate analog" to future courts. *Id.* The Fifth Circuit in *Boehringer–Mannheim* considered whether attorneys fees are recoverable "under federal law" in a Warsaw Convention action. *See* 737 F.2d at 459. Citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc.,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975), it concluded they were not recoverable under the common law American Rule. *See also In re Korean Air Lines,* 704 F.Supp. at 1154 (applying federal common law to claim for jury trial under the Warsaw Convention and the Death on the High Seas Act). Thus, we adopt substantive federal common law as the law governing the cause of action under the Warsaw Convention.

### B. *Nature of the Federal Cause of Action: Tort not Contract*

■ The next question is what is the type and content of this substantive law. Pan Am argues that we must interpret the Treaty in a manner consistent with the "shared expectations of the contracting parties," and that the framers of the Convention intended to create a cause of action sounding in contract. We do not doubt that the Convention was drafted against a civil law background that placed the cause of action in contract. *See Saks,* 470 U.S. at 399, 105 S.Ct. at 1342 (Convention was "drafted in French by continental jurists"); Miller, *Liability in International Air Transport,* at 235; Lowenfeld & Mendelsohn, at 498–500.

Nonetheless, the label "contract" is misleading, and of little use in determining the substance of the cause of action created by the Convention. The bodies of common and civil law of contract are not identical. Common law tends to classify damages intended to compensate or punish as sounding in tort, and any measure of damages meant to give the plaintiff the benefit for which he bargained as sounding in contract. Yet, under the French law governing a contract of carriage—which is the type of contract at issue here—the contract "can provide a basis for any action, be it wrongful death, personal injury, delay or damage to baggage or cargo." Miller, *Liability in International Air Transport* at 231. In fact, the primary result of placing the action in contract rather than negligence in French law is that the plaintiff need not prove negligence in order to recover for injuries stemming from an accident. *Id.* at 237 & n. 19; Calkins, *The Cause of Action,* 26 J. Air L. & Com. at 219–20. Even the legal consequences of gross negligence fall under the rules of contract: "[u]nlimited liability in cases of *dol* or *faute lourde* [loosely translatable as gross negligence] is sometimes seen as having a tortious nature but, more often, it is analyzed as an aggravated liability which retains its contractual nature. The very rule that the liability limitations are set aside is itself considered as a rule of contractual liability." *Id.* at 234.

In searching for the appropriate source from which to draw federal common law, the closest analog is not contract, but tort law, for the causes of actions the Convention preempts are the types of claims the common law normally associates with the law of tort. Consequently, in the absence of a specific conflict between the Convention, as interpreted in the context of the shared expectations of the contracting parties, we look to the common law of tort in order to determine the elements of the cause of action under the Convention.

■ Federal common law of tort recognizes the right to a wrongful death recovery, *see Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 409, 90 S.Ct. 1772, 1792,

26 L.Ed.2d 339 (1970), and allows an award of punitive damages, see Smith, 461 U.S. at 34–35, 103 S.Ct. at 1628–29, but solely to punish a defendant and deter certain kinds of conduct. See Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 306 & n. 9, 106 S.Ct. 2537, 2542 & n. 9, 91 L.Ed.2d 249 (1986). Hence, because federal common law does not accord a right to recover for a compensatory element in a punitive damages claim, we need only decide whether the convention permits recovery of punitive damages to punish a defendant and deter certain kinds of conduct. With the inquiry thus focused, we turn now to the text of the Convention.

## V  THE TREATY

■ Ordinarily, we would start at the outset with the text of the Warsaw Convention in deciding whether it permits an award of punitive damages. But when, as in this case, the text does not address the question presented, we may—as in the earlier discussion—also examine the purposes for which the Convention came into being, its history, the negotiations leading to its adoption, and how the contracting parties have construed the Convention. See Saks, 470 U.S. at 396–97, 400, 105 S.Ct. at 1340–41, 1342, citing Choctaw Nation of Indians v. United States, 318 U.S. 423, 431–32, 63 S.Ct. 672, 677–78, 87 L.Ed. 877 (1943); Chan, 109 S.Ct. at 1683; Fothergill v. Monarch Airlines Ltd., [1981] A.C. 251, [1980] 2 All.E.R. 696, [1980] 2 Lloyd's Rep. 295 (H.L.).

■ The Convention represents an entire liability scheme, and was intended to serve as a uniform, international law. See Block, 386 F.2d at 337–38. As such, its terms should be read in that context, see Reed, 555 F.2d at 1083, and the words used should be given "a meaning consistent with the shared expectations of the contracting parties," Saks, 470 U.S. at 399, 105 S.Ct. at 1342, in order to more completely effectuate the Convention's purposes. See Benjamins, 572 F.2d at 917–18; Eck v. United Arab Airlines, Inc., 360 F.2d 804, 812 (2d Cir.1966); cf. Day v. Trans World Airlines, 528 F.2d 31, 38 (2d Cir.1975), cert.

denied, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976). With this in mind, we turn to the text of the relevant Articles.

### A.  Article 17

1. Text. The provision that establishes a carrier's liability—Article 17—reads as follows in French, the official language of the Warsaw Convention:

Le transporteur est responsable du dommage survenu en cas de mort, de blessure ou de toute autre lésion corporelle subie par un voyageur lorsque l'accident qui a causé le dommage s'est produit à bord de l'aéronef ou au cours de toutes opérations d'embarquement et de debarquement.

The English translation of this Article, as set forth in the United States Code, is:

The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

49 U.S.C. app. § 1502 note.

The parties to the present litigation agree that the minutes and notes of the Convention shed no light on whether the drafters contemplated that a carrier's liability under Article 17 was limited to compensatory damages only. Liability under Article 17 was obviously meant to be limited to 125,000 francs by Article 22(1), and is now limited to $75,000 by the Montreal Agreement. Determining whether the Convention ever allows a recovery of punitive damages in cases it governs is the subject to which this opinion is directed.

2. Examining "dommage survenu". The first step in determining whether Article 17 contemplated punitive damages is to examine the legal meaning of the term the Article uses, "dommage survenu", to see if it excludes that possibility. See Saks, 470 U.S. at 399, 105 S.Ct. at 1342. Plaintiffs argue that "du dommage survenu" means "damages occurred" or "arrived" or "happened," not "sustained" and thus Article 17

contemplates punitive damages. Pan Am contends that the proper translation is "sustained," but that the exact translation does not matter because punitive damages do not "happen" or "occur" any more than they are sustained; rather punitive damages are imposed by a jury or a court.

We are convinced that the proper translation is "damage sustained" and deduce therefore that Article 17 contemplates monetary or compensatory damages only. The translation of "du dommage survenu" as "damage sustained" is the one made by the State Department and found in the United States Code, and it was the translation used in 1934 when the Convention was sent to the Senate for ratification. In addition, two later Conventions held to revise the Warsaw Convention used English as one of the official languages and both used the "damage sustained" translation. *See* Protocol to Amend the Convention of Certain Rules Relating to International Carriage by Air signed at Warsaw on 12 October 1929. The Hague, Sept. 1955 (Hague Protocol); International Conference on Private Air Law, Guatemala City, Sept. 1961 (Guatemala Protocol). The United States Senate has not ratified either of these Protocols, so they provide no binding authority, but they are nonetheless evidence of the expectations of the contracting parties to the Convention.

The English courts have also interpreted "dommage survenu" as limited to monetary loss, *see Fothergill,* 2 Lloyd's Rep. at 299 (H.L.) (Lord Wilbeforce) ("in the *English text,* the word 'damage' in the Convention is used in more than one sense. Sometimes it means 'monetary loss'—for example in art. 17, or art. 19. Sometimes it means 'physical damage' e.g. art. 10.") (emphasis in original). The interpretation adopted by the English courts is entitled to some weight in our attempt to plumb the meaning of the Convention's ambiguous wording. *See Chan,* 109 S.Ct. at 1683; *Reed,* 555 F.2d at 1083; *Day,* 528 F.2d at 35. Moreover, the only two American cases that appear to have discussed this issue directly, have concluded that "dommage survenu" is entirely compensatory in tone. *See Floyd,* 872 F.2d at 1486–89; *In re Air Crash Disaster at Gander, Newfoundland,* 684 F.Supp. at 931.

Whatever the shades of meaning in the word "survenu", we agree that the way in which the Convention uses the term indicates that Article 17 refers to actual harm caused by an accident rather than generalized legal damages. The Article's later language—"subie par un voyaguer lorsque l'accident qui a caus le dommage" (literally, suffered by a traveller if the accident that caused the damage)—supports the compensatory interpretation of the term "du dommage survenu," because an accident does not "cause" punitive damages. *Cf. Saks,* 470 U.S. at 397–400, 105 S.Ct. at 1341–42 (discussing the concept of causation in Article 17).

The context within which the Convention was written adds further support to the conclusion that the damages contemplated by Article 17 are purely compensatory. Under civil law, as noted, an action under the Warsaw Convention sounds in contract. Punitive damages are generally not available in civil law contract actions. In fact, under the civil law they do not appear to be available at all. *See Cooperativa de Seguros Multiples de Puerto Rico v. San Juan,* 289 F.Supp. 858, 859–60 (D.Puerto Rico 1968); 2 M. Planiol & G. Ripert, *Treatise On the Civil Law,* Pt. 1, § 247 (trans. Louisiana St. Inst. with the authority of Librarie Generale de Droit et de Jurisprudence Paris, 11th Ed.1939).

Plaintiffs nevertheless argue in support of their position that the national laws of many of the contracting parties allow the equivalent of punitive damages because they weigh the degree of fault in tort actions. Concededly, some civil law countries do consider the degree of fault in assessing damages, but these damages are generally "free from punitive considerations" and "can be reduced to the principle that plaintiff is entitled to adequate compensation or satisfaction for the mental harm." Stoll, *Penal Purposes in the Law of Tort,* 18 Am.J. of Comp.L. 3, 4 (1970) (Stoll, *Penal Purposes* ).

In German law, for instance, damages may be awarded to vindicate the plaintiff's "outraged sense of justice," but they are awarded to compensate the plaintiff, not to punish the defendant. *Id.* at 4–5. French law considers fault in those cases where it is awarding "dommage moral," or moral damages, which are usually equivalent to damages for pain and suffering, grief, shame, or disfiguration. Lowenfeld, *Aviation Law*, § 1.52 at 7–19 (2d ed. 1981); R. Mankiewicz, *The Liability Regime of the International Air Carrier* 157 (1981). Again, these damages are not intended to punish the defendant or to deter similar conduct.

Plaintiffs' response is that the Convention may not be construed solely with reference to civil law because England, a common law country, was also instrumental in drafting it. But there is no significant difference in wrongful death cases between the English law and the civil law of punitive damages. Like German and French law, English law may sometimes award aggravated damages to satisfy a plaintiff's sense of outrage, as in a libel case, but damages awarded for the purpose of punishing the defendant have always been rare in England. *See* Stoll, *Penal Purposes*, 18 Am.J. of Comp.L. at 4–5. Further, since adhering to the Convention, England has generally limited the recovery of punitive damages to unique and rare circumstances. *See Rookes v. Barnard,* [1964] 1 All E.R. 367, 410 (H.L.) (opinion of Lord Devlin). Thus, none of the original contracting parties to the Convention can reasonably be said to have shared any expectation that Article 17 would create liability for punitive damages.

Hence, the sum of the context in which the Article was written, the law of the contracting parties, subsequent interpretations, and the historical translation argue persuasively that Article 17 establishes liability for compensatory damages only, and that it would be inconsistent with the purposes of the Warsaw Convention to read Article 17 as permitting the recovery of punitive damages.

## B. *Article 24(2)*

1. *Text.* Plaintiffs next contend that whatever the meaning of "dommage survenu," the Convention expressly left the types of recoverable damages to local law, in the same way that it left the question of contributory negligence and what parties could sue to local law. This argument is based on Article 24, which states

(1) In the cases covered by articles 18 and 19 [baggage claims] any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention.

(2) In the cases covered by article 17 the provisions of the preceding paragraph shall also apply, without prejudice to the questions as to who are the persons who have the right to bring suit and what are their respective rights.

49 U.S.C. app. § 1502 note.

An argument for the availability of state causes of action under the Convention—as distinguished from the availability of state causes of action outside the Convention, a possibility we rejected earlier—is that the language of the Convention itself preserves them. Article 24(1) provides that "any action for damages, however founded, can only be brought subject to the conditions and limits" of the Convention. This language is subject to two interpretations. The first is that a local cause of action (actions "however founded") may be brought, but that it is subject to the conditions and monetary limits of the Convention. The second interpretation is that a plaintiff, whatever his damages, cannot circumvent the Convention by bringing any action other than one under Article 17.

Courts that have considered this language have not agreed on whether the cause of action created under the Convention was meant to be exclusive. *See Floyd,* 872 F.2d at 1482, n. 33 (citing cases). Although the long list of cases cited by *Floyd* would seem to indicate otherwise, there is a paucity of direct authority on this question, with only the Fifth Circuit having directly ruled on it.

Again, plaintiffs and defendant agree there is no drafting history to indicate that

the contracting parties intended this section to have any effect on the specific question of whether local law should govern on the issue of allowance of punitive damages. Plaintiffs insist that the last part of Article 24(2), "without prejudice as to ... what are their respective rights," leaves the question of the elements of damages to local law and thereby effectively also directs the court's inquiry on the issue of punitive damages to local law. Pan Am views the phrase as intending to leave to local law only such questions as who is a proper plaintiff and the respective rights of beneficiaries regarding descent and distribution arising from the death of a passenger.

Commentators and case law are in accord that the Convention leaves the measure of damages to the internal law of parties to the Convention. *See Harris*, 820 F.2d at 1002 ("Evidently damages are to be measured according to the internal law of a party to the Convention"); *Mertens*, 341 F.2d at 858 ("It seems clear that the Warsaw Convention left [the issue of which items of damage can be properly included in the award—e.g. mental anguish], as it did other issues, such as who are the proper beneficiaries of a damage award, to the internal law of the parties to the Convention."); Miller, *Liability in International Air Transport* at 117; Drion, *Limitation of Liabilities* at 125–26; N. Matte, *Treatise on Air–Aeronautical Law* 383 (1981). None of these authorities seems to have considered whether the "type" of compensable damages left to local law could include punitive damages. When the *Harris* court applied Polish law to the calculation of damages, it did not mention punitive damages, but only referred to the way in which pecuniary loss, such as funeral expenses and lost financial support to the survivors, should be calculated. *See Harris*, 820 F.2d at 1004–05. Nor did either of the other courts suggest that in mentioning the "types" or "elements" of a damage award they meant anything more than how to calculate compensatory damages.

2. *Drafting History.* The drafting history of Article 24 indicates that the cited clause was primarily aimed at questions of descent and distribution. The initial draft, prepared at the 1925 Paris conference, provided:

> In case of decease of a passenger carried, the lawsuit regarding responsibility may be taken by the persons who have a right to take such action according to the law of the land of the deceased person but under the reserve of the limitation of responsibility provided for in the foregoing article.

International Conference on Private Aviation Law (Paris 1926) (State Department Translation) Addendum at 12a. The accompanying official report stated that:

> There is a need to determine exactly the extent of the rights of legal claimants for, depending on the national laws, the nature of their rights could lead to an interpretation different from the legal basis and somehow cancel the limitation set by the preliminary project. Since it is impossible to set in a single formula the various legal concepts of the various States, it appeared simpler to specify in Article 8 that the claimants would be determined according to the national law of the deceased, but that the rights of these persons would be limited to the maximum sum allowed by Article 7.

International Conference on Private Aviation Law (Paris 1926) Addendum at 7a.

As this report plainly states, the drafters' primary concern stemmed from the fact that the laws of descent regarding a person's ability to claim damages in a wrongful death action vary widely according to national laws. *See* Haanappel, *The Right to Sue in Death Cases under the Warsaw Convention*, 6 Air L. 66, 69–70 (1981); Mankiewicz, *The Liability Regime of the International Air Carrier* at 161–66. For example, in France the decedent's heirs inherit the right to sue on the decedent's behalf, but close family members and even a divorced spouse have the right to sue for personal damages. Haanappel, *The Right to Sue*, 6 Air L. at 73. It was feared by the drafters that if the heirs brought a contractual action, but those entitled to sue for personal damages brought tort actions, the sum of the actions might exceed the liability limit imposed by the

Convention. *See* Drion, *Limitation of Liabilities* at 71–72. Thus, in recognition of the widely varying laws of descent, the drafters gave up any attempt to decide who could sue and on what legal basis, but instead explicitly provided that no matter how many plaintiffs were involved or what their rights were under local law, in no event could the sum total of recovery exceed the Convention's liability limit.

A draft convention in 1928 changed the provision to read:

> In the event of death of the holder of the right, any action in liability, however founded, can be exercised ... by the persons to whom this action belongs according to the national law of the deceased or, in the absence hereof [sic], according to the law of his last domicile.

CITEJA Report, 3d Session, May 1928, *quoted in* Haanappel, *The Right to Sue*, 6 Air L. at 67. Discussions held during the next two years led the drafters to abandon the choice of law rule favoring the decedent's domicile, thus leaving both the choice of law and the question of the rights of legal claimants to "general principles of private international law and to the internal legislation of States." *Id.* at 67; *see* Drion, *Limitation of Liabilities* at 126. The Final CITEJA Report drafted by the official Reporter for the Convention, Henri deVos, stated

> The question was asked of knowing if one could determine who are the persons upon whom the action devolves in the case of death are, and what are the damages subject to reparation. It was not possible to find a satisfactory solution to this double problem, and the CITEJA esteemed that this question of private international law should be regulated independently from the present Convention.

Report of Henri deVos, CITEJA Reporter (September 1928), *translated and reprinted in* Second International Conference on Private Aeronautical Law, p. 255 (R. Horner & D. Legrez trans. 1975).

Nothing in this drafting history suggests that the drafters ever considered that they might be allowing a contracting party to impose punitive damages. DeVos's use of the word "reparation" tends to exclude the concept of punitive damages, as does the nature of the liability created by Article 17—found earlier to be purely compensatory. Hence, the drafting history of Article 24, together with the civil law background of the Convention, make it extremely unlikely that Article 24(2) was intended by its drafters to preserve a common law right to punitive damages.

The drafters' silence on this subject leads logically to the assumption that punitive damages were not addressed because they were never contemplated. The plaintiffs maintain that the fact that the Convention never referred to punitive damages is without significance because the Convention left the calculation of damages to local law, and did not need therefore to address the subject. Yet, there can be no doubt that had the question been raised it would have been hotly debated, especially since the concept is unique to the common law, and also because many of the airlines were state-owned. Again, nothing in the Convention's drafting history points to the drafters contemplating that the Convention would be used to punish or deter tortious behavior on the part of airlines. Rather, all of the drafters' actions point to the conclusion that they sought to limit recovery simply to compensation.

3. *Other Authority on Article 24.* As is evident, the case law on this topic is remarkably sparse, and what little exists is short on analysis. Commentators also provide little help. According to the Chief United States' delegate to the Hague Conference—a later Convention held to modify the liability limitations of the Warsaw Convention—the drafters of Article 24 discussed the possibility of tort suits during preliminary discussions and "no attempt was made by the framers of the Convention to outlaw the right of a plaintiff ... to bring an action in tort." Calkins, *The Cause of Action*, 26 J.Air L. & Comm. at 327–28. Pan Am points out that this conclusion was based on comments by the French delegate, M. Ripert, but that the French have interpreted the Treaty as cre-

ating an exclusive cause of action. *See* Miller, *Liability in International Air Transport* at 237 (French court held "the convention had established a liability regime which excluded any action based on other principles."). In any event, it is possible that the phrase "however founded" was simply intended to prevent an injured party's relatives from bringing an independent action, outside the contract action which the injured person himself might bring, for loss of support. *See* Drion, *Limitation of Liabilities* at 71.

### C. *Article 25*

1. *Willful Misconduct.* Discussion now turns to whether punitive damage claims are contemplated by the Convention under the willful misconduct language of Article 25, and thus form part of the damages recoverable under the federal action. Plaintiffs assert that even if Article 17 does not allow recovery of punitive damages, that provision becomes inoperative in the event of the carrier's willful misconduct under Article 25 since the Article is then a "limitation or exclusion".

We conclude that Article 17 is not one of the limitations or exclusions to which Article 25 refers; Article 25 voids only certain provisions in the event of willful misconduct, but the rest of the Convention remains fully operative, and the Convention as it then remains still is inconsistent with the notion of a punitive damages recovery. An examination of the inconsistency between punitive damages and the accomplishment of the purposes of the Convention demonstrates that the shared expectations of the drafters did not include the recovery of punitive damages, even in the event of willful misconduct.

2. *Lifting of Liability Limitations.* Article 25 provides as follows:

The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his willful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to willful misconduct.

49 U.S.C. app. § 1502 note.

Plaintiffs make two related arguments in support of their position that Article 25 allows punitive damages claims in cases of willful misconduct. First, plaintiffs contend that, by lifting the $75,000 limit on damages, Article 25 lifts any and all limitations on damages. Next, plaintiffs insist that Article 17—when read to create a cause of action for compensatory damages and to preempt pre-existing state causes of action that included recovery of punitive damages—functions as a limitation on a plaintiff's recovery. In effect, Article 17 bars a plaintiff from seeking the punitive damages to which he or she would have been entitled had the United States never ratified the Warsaw Convention. Therefore, plaintiffs continue, Article 17 is a limitation on a carrier's liability that must be lifted when the carrier is guilty of willful misconduct.

In support of their first argument, plaintiffs point out that both the provisions of Article 25 and the right to recover punitive damages under American tort law are triggered by a defendant's willful misconduct. *See* 22 Am.Jur.2d *Damages* § 764 (1988). Hence, it seems natural to believe, they add, that the purposes of Article 25 bear some relation to those of punitive damages and that punitive damages are implicitly authorized by Article 25. Quite the contrary, we think lifting the monetary limit on compensatory damages is the Convention's sole response to willful misconduct, and that it stems not from the wish to punish the defendant but from the idea that a party cannot rely on exclusions to escape from his own wrongdoing. Drion, *Limitation of Liabilities* at 262.

The idea of deterrence is inherent in both concepts, but it would be a mistake to conclude that the presence of a civil law concept necessarily authorizes the application of a superficially similar, but actually different, common law concept. In fact, the civil law appears to judge that the award of full compensatory damages alone is sufficient to deter willful misconduct, so

punitive damages would be both excessive and redundant. Thus, "[f]or the carrier the consequences of an air accident are such that there would seem to be little need for an additional incentive to prevent such accidents by increasing his liability towards passengers and shippers." *Id.* at 211.

Moreover, even when the liability limit is eliminated, the rest of the Convention still governs the action. *Id.* at 261; *cf.* D. Goedhuis, *National Airlegislations and the Warsaw Convention* 155–56 (1937) (similar to willful misconduct, irregularity in traffic documents results in unavailability of provisions that limit or exclude the carrier's liability, but this "in no way implies that all the rules of the Warsaw Convention should no longer be applied ... all the rules remain in force except those that limit or exclude" liability). Consequently, when the Convention refers to terms that limit or exclude liability, it refers solely to terms within the Convention itself, as conceived by the contracting parties. *See* Drion, *Limitation of Liabilities* at 261. As to plaintiffs' second argument that Article 17 functions as a limitation on liability, it is settled that Article 25's reference to provisions that "exclude or limit" liability includes at least Articles 20(1) (due diligence and impossibility defenses) and 22(1) (monetary limits) of the Convention. *See Molitch v. Irish Int'l Airlines*, 436 F.2d 42, 44 & n. 1 (2d Cir.1970); *Grey v. American Airlines*, 227 F.2d 282, 285 (2d Cir.1955), *cert. denied*, 350 U.S. 989, 76 S.Ct. 476, 100 L.Ed. 855 (1956). Which of the other provisions are included is in doubt. One commentator includes both Article 21 (contributory negligence), and Article 26(4) (statute of limitations for baggage and cargo), Shawcross & Beaumont, *Air Law*, VII(213) (4th ed. 1990). Article 25, however, does not lift every limit on a carrier's liability. For example, it does not lift Article 29's statute of limitations. *See Molitch*, 436 F.2d at 44. No authority has been cited by plaintiffs for the proposition that Article 25 refers to Article 17.

As noted above, Article 25 only refers to terms within the Convention. The framers, looking at the Convention from the background of the civil law, saw Article 17 as a means of creating liability or at the very least shifting the burden of proof to the carrier. Article 17 was not envisioned as a limit or exclusion of liability because, to a civil lawyer unfamiliar with the concept of punitive damages, Article 17 does not appear to limit liability in any way. For us to impose a common law view on the document, twisting the apple to appear to be an orange, would violate principles of Treaty interpretation.

A counterpart to Article 25 is found in many civil law countries that have statutory limits on personal injury recoveries from common carriers. For example, Mexico, El Salvador, Guatemala and Argentina all have various liability limits according to the gravity of the injury, but all provide that when the accident is due to "dolo," the Spanish equivalent of "dol," then the liability is unlimited. Cagle, *The Role of Choice of Law in Determining Damages for International Aviation Accidents*, 51 J.Air L. & Com. 953, 966–70 (1986) (Cagle, *The Role of Choice of Law* ). Nevertheless, none of these countries allow plaintiffs to recover punitive damages as well as unlimited compensatory damages when the liability limit is lifted.

While Article 25 has been the subject of negotiations regarding its revision, and has been criticized as unclear, *see* Lowenfeld & Mendelsohn, at 503, 505, these later negotiations bear out the conclusion that the parties did not believe the Convention allowed for punitive damages. In the 1960's, when the United States gave notice of denunciation of the Convention because of its low limits on victim compensation, and then negotiated the Montreal Accord with various international air carriers, much of the debate among the delegates at the negotiating sessions centered around the proper level of compensation. *See, e.g.,* Lowenfeld & Mendelsohn, at 565–66. Amidst all this talk of what a plaintiff might recover, none of the delegates, including those from the United States, raised a question regarding the possible availability of punitive damages. *See generally id.* (detailing the negotiating history of the Montreal Accord).

Similarly, the Guatemala Protocol to the Warsaw Convention—which the United States has not ratified—basically eliminated Article 25, raising the liability limit to 1,500,000 francs per passenger but making that limit apply even in the event of the carrier's willful misconduct. Cagle, *The Role of Choice of Law*, 51 J.Air L. & Com. at 989. Because the Guatemala Protocol would not even allow unlimited compensatory damages, it follows *a fortiori* that the contracting parties to the Convention did not contemplate punitive damages. Moreover, all of the negotiation preceding the action concerned the circumstances in which Article 25 comes into play and about how to translate the concept of *dol* into English, not about the extent of the carrier's liability once the Article was invoked. *See* Miller, *Liability in International Air Transport* at 78. The absence of the dispute, particularly in the context of the civil law, evinces an assumption that Article 25's "unlimited liability" meant only unlimited compensatory liability.

## VI  POLICY CONSIDERATIONS

Finally, consideration of the purposes behind the Convention compel the conclusion that the shared expectations of the Convention's drafters did not contemplate that punitive damages be available under the Convention. Although the Convention's language must be construed in a way to avoid impairing pre-existing rights such as the right to punitive damages, if reasonably possible, *see, e.g., Guaranty Trust Co. v. United States*, 304 U.S. 126, 143, 58 S.Ct. 785, 794, 82 L.Ed. 1224 (1938); *Herd & Co. v. Krawill Machinery Corp.*, 359 U.S. 297, 304–05, 79 S.Ct. 766, 770–71, 3 L.Ed.2d 820 (1959), an examination of this question in light of the Convention's purposes is persuasive proof that the drafters—and the United States when it adhered to the Convention—could not have intended to permit a right to obtain punitive damages. Interpreting the Convention to allow such recovery would severely hobble most of the aims the Convention sought to accomplish: establishing a uniform carrier liability regime, limiting carrier liability to ensure a viable industry, ensuring the carriers' ability to insure against losses, and adequately compensating injured passengers quickly and with a minimum of litigation. We discuss briefly some of those policies.

### A.  *Uniformity*

Allowing punitive damages would undoubtedly destroy uniformity. No other signatory allows them. The Convention should be read to further its purposes to the greatest extent possible, and one of its primary purposes was to achieve uniformity in the liability and amount of damages awardable. No authority that we have unearthed demonstrates that any other country has awarded punitive damages under the Convention. The goal of uniformity "would be greatly defeated if it were left to the national legislator" to set aside all other provisions of the Convention and replace the Convention with national law in the case of willful misconduct. Drion, *Limitation of Liabilities* at 261. Were the United States alone to allow such recoveries, it would act as a magnet so that every airline injury claim would, if possible, be brought in the United States. The enormous difference between the damages recoverable here and those recoverable in other forums would thereby destroy much of the value of the Convention.

### B.  *Carriers' Ability to Insure Against Losses*

Allowing punitive damages recoveries might well also defeat the goal of making airlines insurable. First, airlines might not be able to obtain such insurance because a number of states have traditionally barred insurance coverage of punitive damages on the theory that such coverage is contrary to public policy because it lessens the defendant's incentive to take reasonable care or at least not to commit willful misconduct. *See* Mooney, *The Liability Crisis—A Perspective*, 32 Vill.L.Rev. 1235, 1237–38 & n. 9 (1987) (Mooney, *The Liability Crisis*); Comment, *Punitive Damages: The Burden of Proof Required by Procedural Due Process*, 22 U.S.F.L.Rev. 99, 102 & n. 8 (1987). If an airline could not find an insurer able or willing to sell insurance

for punitive damages, it might well choose to go out of business, or at least out of the international market, rather than risk bankruptcy with every flight.

Second, even if the airline industry could obtain such insurance, the cost of a ticket would skyrocket in response to the higher cost of such insurance. *Cf.* Mooney, *The Liability Crisis* at 1259 (in Canada, which has caps on non-economic awards, the average premium is one third that of the average premium in the United States). The extra costs of higher insurance, plus the uninsurable risks, would increase the costs of airlines overall and could—as currently escalating fuel costs have demonstrated—contribute to the downfall of an airline teetering on the edge of insolvency. It is also likely that punitive damages recoveries would inhibit innovation in the industry. *Cf. Browning–Ferris*, 109 S.Ct. at 2924 (O'Connor, J. concurring in part and dissenting in part) ("designers of airplanes and motor vehicles have been forced to abandon new projects for fear of lawsuit that can often lead to awards of punitive damages"), *citing* P. Huber, *Liability: The Legal Revolution and Its Consequences* 152–171 (1988).

In addition, insurance companies would have a difficult task calculating how much to charge its insureds because punitive damages are left to the discretion of the judge and the jury and vary not only according to the gravity of the conduct but also according to the defendant's wealth. 22 Am.Jur. *Damages* §§ 739, 806, 807. Thus, the wealthier the airline, the more likely the punitive damage award will be high. *See* Belli, *Punitive Damages*, 49 UMKC L.Rev. at 13. The resulting unpredictability of punitive damages awards has caused difficulties in other sectors of the insurance industry. *See* Mooney, *The Liability Crisis*, 32 Vill.L.Rev. at 1258, 1260. The goal of ensuring a viable airline industry to foster commerce and make international travel more extensive and accessible would be seriously undermined by allowing punitive damages.

### C. *Compensating Plaintiffs Quickly with a Minimum of Litigation*

Again, punitive damages recoveries would increase litigation in general because every plaintiff would claim willful misconduct. The drafters were aware that allowing a plaintiff to escape all liability limitations merely upon an allegation of willful misconduct would "in every case ... permit the plaintiff to bother the carrier." Minutes and Documents, CITEJA, Third Session, Madrid, 1928, at 53–54 (Remarks of Mr. Richter), *quoted in* Calkins, *The Cause of Action* 26 J.Air L. & Com. at 226. Precisely because punitive damages recoveries are unpredictable, there is greater incentive to litigate a case to the end rather than settle. *See* Comment, *Punitive Damages*, 22 U.S.F.L.Rev. at 102; Ellis, *Fairness and Efficiency in the Law of Punitive Damages*, 56 S.Cal.L.Rev. 1, 45–46 (1982).

Despite the benefit to some plaintiffs who would recover such awards, other plaintiffs would be required to go through years of litigation to obtain awards whose value would be much reduced by litigation costs and the passage of time. *See* Lowenfeld & Mendelsohn at 600. In sum, the goal of discouraging litigation, along with all of the other major goals of the Convention, is inconsistent with the recovery of punitive damages.

### CONCLUSION

Although the analysis required to reach it has been extensive, the position we take is simple: punitive damages are not recoverable in actions governed by the Warsaw Convention. Therefore, the judgment of the court in Joshi v. Pan American World Airways, Inc., denying partial summary judgment on the motion to dismiss plaintiffs' claims for punitive damages is reversed and the claims for punitive damages are dismissed. The judgment of the court in Rein v. Pan American World Airways, Inc., dismissing plaintiffs' punitive damage claims, is affirmed.