Edward E. GATZ and Donald D. Graham, individually and on behalf of those similarly situated, and Edward E. Gatz and Donald D. Graham, derivatively on behalf of Regency Affiliates, Inc., Plaintiffs,

v.

William R. PONSOLDT, Sr.; Statesman Group, Inc.; William R. Ponsoldt, Jr.; Marc H. Baldinger; Stephanie Carey; Martin J. Craffey; Royalty Holdings, L.L.C.; Royalty Management, Inc.; Laurence Levy; and Regency Affiliates, Inc., Defendants.

No. 4:02CV3113.

United States District Court, D. Nebraska.

July 7, 2003.

1144

Trenten P. Bausch, Nicole T. Bock, Thomas H. Dahlk, Michael S. Degan, L. Steven Grasz, Angela M. Lisec, Daniel A. Morris, Joy A. Nesbitt, Blackwell, Sanders Law Firm, Omaha, NE, for Plaintiffs' Counsel.

Rodney M. Confer, Thomas E. Jeffers, Jeanelle R. Lust, Kevin R. McManaman, Joseph A. Wilkins, Knudsen, Berkheimer Law Firm, Lincoln, NE, Alan J. Mackiewicz, Omaha, NE, Jeremy T. Fitzpatrick, Richard P. Jeffries, Bartholomew L. McLeay, Suzanne M. Shehan, Kutak Rock, LLP, Omaha, NE, William G. Dittrick, Patrick J. Ickes, Gerald P. Laughlin, Baird, Holm Law Firm, Omaha, NE, for Defense Counsel.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This is a derivative class-action RICO[1] suit brought by shareholders of Regency Affiliates, Inc., ("Regency") against Regency's former executive officer, director, and controlling stockholder who allegedly implemented a fraudulent scheme to carry out self-dealing transactions; against former Regency directors for breaching their fiduciary duties and duties of loyalty in failing to prevent the fraudulent actions; against Regency's new chief executive officer; and against the owner of approximately 38.45% of Regency's common stock—which was purportedly purchased at an unreasonable price—and the holder of a promissory note now convertible into approximately 21.55% of additional shares of Regency common stock. (Filing 157, Amended Complaint ¶ 1.) The plaintiffs seek money damages and declaratory and injunctive relief to prevent furtherance of the defendants' alleged unlawful scheme to dilute the cash value and voting power of the shares owned by the class and to seize control of Regency's interest in a limited partnership that owns real estate valued at over $170 million. (*Id.* ¶¶ 2–3.)

## I. BACKGROUND

### A. The Plaintiffs and Defendants

Plaintiffs Edward Gatz and Donald Graham live in Omaha, Nebraska, and are the owners of 61,370 and 1,064 respective shares of Regency common stock. Defendant William R. Ponsoldt, Sr. ("Ponsoldt Sr."), is a Florida resident who "dominated the affairs of Regency" until October 28, 2002, and who became Chairman of the Board of Regency in 1996, and CEO and President in 1997.

Defendant Statesman Group, Inc. ("Statesman"), is a Bahamian corporation with its principal place of business in Nassau, the Bahamas. Statesman is dominated and controlled by Ponsoldt Sr. and until October 16, 2002, Statesman claimed ownership of 38.9% of the outstanding shares of Regency common stock and 50% of the outstanding shares of Regency Series C Preferred Stock. (*Id.* ¶¶ 6–7.) Statesman was formed for the purpose of investing in the United States and elsewhere on behalf of the Statesman Trust, an irrevocable trust settled by Ponsoldt Sr. in the Bahamas. Statesman has never been registered as a foreign corporation doing business in Nebraska; has never maintained an office in Nebraska; has never sent any employees or agents to Nebraska; and has not held any bank accounts, real estate, or personal property in Nebraska. (Filing 189, Ex. N, Decl. Statesman Group, Inc. ¶¶ 4–5.)

Defendant William R. Ponsoldt, Jr., ("Ponsoldt Jr.") is Ponsoldt Sr.'s son and he resides in Florida. Ponsoldt Jr. was appointed to the Regency Board of Directors by Statesman and served on the Board from July 1993 to October 28, 2002. Defendant Marc H. Baldinger ("Baldinger") resides in Florida and served on Regency's Board of Directors from August 1999 to October 28, 2002. Since 2001, Baldinger has served as Regency's Chief Financial Officer. Defendant Stephanie Carey ("Carey") is a resident of the Bahamas who served on the Regency Board of Directors from July 1993 until October 28, 2002. Defendant Martin J. Craffey ("Craffey") resides in New York and served on the Regency Board of Directors from July 1993 to October 16, 2002. During these Board members' terms, they "participated in regular communications with officers of Regency located in Nebraska" and were "paid director fees from

---

1. *See* The Organized Crime Control Act of 1970, Pub.L. No. 91–452, Section 901(a), 84 Stat. 941, Racketeer Influenced and Corrupt Organizations.

Regency bank accounts located in Nebraska." (*Id.* ¶ 7.)

Defendant Royalty Holdings, L.L.C. ("Royalty Holdings"), is a Delaware limited liability company with its principal place of business in New York.[2] Defendant Royalty Management, Inc. ("Royalty Management"), is the managing member of Royalty Holdings and is a Delaware corporation with its principal place of business in New York. Royalty Holdings and Royalty Management were formed in May and October 2002, respectively, for the purpose of participating in a transaction involving Regency, and neither entity has conducted any other business. Neither Royalty Management nor Royalty Holdings have been registered to do business in Nebraska; have never maintained an office in Nebraska; have never sent any employees or agents to Nebraska; and have never held any bank accounts, real estate, or personal property in Nebraska. (Filing 187, Ex. A., Aff. Laurence Levy.) Defendant Laurence Levy ("Levy"), a resident of New York, is the current Regency President, CEO, and Chairman of the Board, and is also Royalty Management's President and sole director and stockholder. (Filing 157, Amended Complaint ¶ 7.)

None of the individual defendants has ever resided in Nebraska, owned or rented property in Nebraska, had any personal property in Nebraska, maintained a bank account in Nebraska, or voted or filed a tax return in Nebraska. Defendant Levy has never been present or visited Nebraska; defendants Baldinger, Craffey, and Carey visited Nebraska once for an August 5, 1999, Regency shareholders meeting; defendant Ponsoldt Sr. visited Nebraska twice—once for the 1999 shareholders meeting and once to visit Larry Horbach, a former Regency director and interim chief financial officer; and Ponsoldt Jr. visited Nebraska once in December 2000 to procure documents from Horbach which are unrelated to the claims against Ponsoldt Jr. in this case. (Filing 187, Aff. Laurence Levy; Filing 189, Exs. M, R, S, T, U, Affs. of Individual Defendants.)

Defendant Regency Affiliates, Inc.,[3] is a Delaware corporation. (Filing 157, Amended Complaint ¶ 7.) Regency maintained its principal place of business in Omaha, Nebraska, from 1987 to 1989, again from 1990 to 1993, and for a brief period in 1995. (Filing 270, Stipulation.) Because "Regency's executive offices, and principal place of business, were typically located near the residence of its current President," Regency's principal place of business moved from Nebraska to Illinois, Colorado, and California as Regency's president changed. (Filing 270, Stipulation.) When Ponsoldt Sr. became Regency's Chairman of the Board in 1996, Regency moved its principal place of business to Stuart, Florida, where Ponsoldt Sr. lived. (Filing 189, Ex. M, Decl. William Ponsoldt, Sr. ¶ 11 & 13; Filing 189, Ex. P, Aff. Larry J. Horbach ¶ 2(q); Filing 270, Stipulation.) In July 2002, Regency's ex-

---

**2.** Plaintiffs allege that Royalty Holdings "joined the conspiracy to loot Regency and damage the Class on or before October 16, 2002" and "knew that this litigation had been filed on May 2, 2002, to stop Ponsoldt and Statesman's looting of Regency and knowingly assisted Ponsoldt and Statesman in receiving an additional $4 million of ill-gotten gains from Regency as part of a recapitalization."

**3.** Plaintiffs state that "Regency Affiliates, Inc. is a corporation organized and existing under the laws of the State of Delaware, and presently has its principal place of business in the State of Florida. Regency is named as a nominal defendant for purposes of the derivative action and as a party to the class action portion of this lawsuit to the extent the declaratory and/or injunctive relief sought herein affects the rights of Regency." (Filing 157, Amended Complaint ¶ 7(j).)

ecutive offices and principal place of business moved to Jensen Beach, Florida, where Regency's corporate documents are now maintained. (Filing 189, Ex. M, Decl. William Ponsoldt, Sr. ¶ 22; Filing 270, Stipulation.)

From 1987 to 1989 and from 1992 to December 2000, Regency maintained its "administrative office" in Omaha, Nebraska, where accounting, bookkeeping, administrative and stock transfer, and bill-paying services were performed. (Filing 189, Ex. P, Aff. Larry J. Horbach ¶¶ 1–2; Filing 199, Ex. 1, Aff. Eunice Antosh; Filing 189, Ex. M, Decl. William Ponsoldt, Sr., ¶ 13; Filing 272, Aff. Larry J. Horbach; Filing 273, Aff. William R. Ponsoldt, Sr. ¶ 2.) This "administrative office" was operated by L.J. Horbach & Associates, which was a company independent of Regency that performed administrative services for other companies as well. Thus, Regency's "administrative office" was not owned or controlled by Regency; rather, it was contracted to perform certain administrative functions for Regency. (Filing 273, Aff. Marc H. Baldinger ¶ 2.)

From February 1994 to January 2001, Regency's administrative checking accounts were located in Omaha, Nebraska. It was from these Omaha accounts that members of Regency's Board of Directors—including defendants Ponsoldt Sr., Baldinger, Craffey, Carey, and Ponsoldt Jr.—received quarterly retainers and fees for attending out-of-state board meetings. These Nebraska accounts were primarily used for current accounts payable; in contrast, Regency used banks in Florida for its business operations. Regency's executive office directed that "[j]ust enough" money be wired to the Nebraska accounts on a monthly basis to cover accounts payable. (Filing 273, Aff. William R. Ponsoldt, Sr. ¶ 8, Aff. Martin J. Craffey ¶ 3, Aff. Stephanie Carey ¶ 4.)

Regency's 1999 annual stockholders meeting was held in Omaha, Nebraska. Regency's corporate secretary, who was located at the Omaha administrative office, received numerous telephone calls and facsimile communications from Regency's board members—including defendants Ponsoldt Sr., Baldinger, Craffey, Carey, and Ponsoldt Jr.—about matters such as financing for Regency, stocks, expense reports, board meetings, and "irrevocable stock and bond power for a Statesman stock certificate." (Filing 199, Ex. 1, Aff. Eunice Antosh; Filing 189, Ex. M, Decl. William Ponsoldt, Sr. ¶ 13.) However, Regency owned no real estate or property in Nebraska, and, from April 1990 to June 1996, Regency was not licensed to do business in Nebraska. (Filing 189, Ex. M, Decl. William Ponsoldt, Sr. ¶ 11.)

### B. The Alleged Fraudulent Scheme

Plaintiffs allege that the defendants participated in a fraudulent scheme to dilute the cash value and voting rights of Regency shareholders, as evidenced by a series of transactions that began in the early 1990s and are described below.

#### 1. Ponsoldt & Statesman Acquire Control of Regency for Property at Prices Alleged to be Fraudulently Inflated

In June 1993, Regency agreed to acquire from defendant Statesman—a Bahamian corporation controlled by Ponsoldt with its principal place of business in New York—80% of the common stock of National Resource Development Corporation (Delaware) ("NRDC–Delaware"), which at that time owned 75 million short tons of quarried and piled aggregate rock located in Michigan. In July 1993, the Acquisition Agreement was closed, with Regency acquiring stock in a newly-formed corporation, NRDC–Nevada, which had acquired

title to the aggregate rock from NRDC–Delaware. The aggregate rock was valued for financial-statement purposes at $15 million, but in fact had only minimal value.

The Acquisition Agreement provided that it was "intended to be performed in the State of Ohio and shall be construed and enforced in accordance with the laws of that jurisdiction." (Filing 189, Ex. L, at 35.) At all times, the aggregate rock referenced in the Agreement remained in Michigan in the possession of NRDC–Nevada, which had no offices, employees, or agents in Nebraska. All sales of the aggregate rock by NRDC–Nevada were to entities located outside of Nebraska, and no agent of Statesman, NRDC–Delaware, or NRDC–Nevada ever visited Nebraska in connection with the negotiation, execution, or performance of the Acquisition Agreement. (Filing 189, Ex. M, Decl. Ponsoldt, Sr. ¶ 12.)

Also in July 1993, Statesman acquired 28.78% of the common shares of Regency and 100% of the outstanding shares of Regency's Series C Preferred Stock, 50% of which has, since that time, been transferred to affiliates of Statesman or Ponsoldt Sr. In December 2001, NRDC sold the aggregate rock to a majority-owned subsidiary of Regency for $18,200,000, plus interest, payable in 96 installments beginning in December 2003. Plaintiffs allege that the defendants will use this sale to increase the redemption price and liquidation preference value of the Series C Preferred Stock owned by Statesman and its affiliates. (Filing 157, Amended Complaint ¶¶ 13–21.)

At the time of these 1993 transactions, Regency's principal executive office was located in Omaha, Nebraska, and Regency's sole officer and director was Larry J. Horbach, who is not a party to this case. (Filing 270, Stipulation.) In July 1993—the same month during which most of the acquisition-related transactions described above occurred—Regency moved its principal executive office to Illinois. (Filing 272, Aff. Larry J. Horbach ¶ 8(c).)

### 2. Regency Acquires Security Land

In late 1994, Regency became a partner in Security Land & Development Company Limited Partnership ("Security Land"), a Delaware limited partnership that owns an office building in Maryland with 717,011 net usable square feet. The building is leased by the Social Security Administration and has a market value of over $170 million. To acquire its partnership interest, Regency contributed $300,000 and net operating loss carryforwards ("NOLs") in excess of $60 million. (Id. ¶¶ 22–26.)

### 3. Ponsoldt Becomes Chairman & CEO of Regency

On August 26, 1996, Ponsoldt appointed himself Chairman of the Board of Regency. After a search for a new president for Regency, the Regency Board of Directors hired Ponsoldt as Regency's President and CEO. (Id. ¶¶ 27–29.)

### 4. Alleged Fraudulent Compensation Agreement & Option

On June 3, 1997, Regency and Ponsoldt Sr. executed an Employment Agreement effective immediately which provided Ponsoldt with an annual salary of $250,000, adjusted annually; additional salary tied to the enhancement of Regency's overall net worth; and the right to purchase Regency stock. (Id. ¶ 31.) Regency's investment in Security Land was structured in such a way that as the loan to Security Land was repaid by the Social Security Administration's rent payments, Regency's asset value increased accordingly, thereby increasing Ponsoldt's salary, which was tied to the overall net worth of Regency. Plaintiffs allege that because Regency has not generated significant revenues since the date

of the Employment Agreement, the Ponsoldt compensation arrangement has caused Regency to incur debt, issue stock to Ponsoldt, and sell valuable corporate assets to pay Ponsoldt. (*Id.* ¶¶ 34–35.)

The Employment Agreement was negotiated between Regency's attorney, who is a resident of Ohio, and Ponsoldt Sr.'s attorney, who is a Florida resident. Unanimously approved by Regency's Board of Directors during a May 21, 1997, telephonic meeting, the Agreement specifically provided that Agreement-related arbitration shall occur in Florida and that Florida law governs the Agreement. Pursuant to the terms of the Employment Agreement, Ponsoldt has always performed his duties as Regency President and CEO in Florida. (Filing 189, Ex. E, Employment Agreement ¶¶ 3(a), 15, 19; Ex. M, Decl. William Ponsoldt, Sr. ¶¶ 13–14.)

On the same date, Ponsoldt and Statesman allegedly caused the Regency Board of Directors to issue an option to defendant Statesman allowing Statesman to acquire 6.1 million shares of Regency common stock. The exercise price of the option was to be computed pursuant to a formula based upon the current market price of the stock at the time the option was exercised. Ponsoldt repeatedly represented to members of the Regency Board of Directors and plaintiffs Gatz and Graham that the option was necessary to protect the NOLs that had been committed to Security Land, and that Statesman would never exercise the option except to prevent a hostile takeover of Regency which could cause Regency to forfeit its ability to use the NOLs. (Filing 157, Amended Complaint ¶ 32.)

None of Ponsoldt Sr.'s involvement with the stock option agreement took place in Nebraska. The negotiations preceding the agreement were handled by Regency's attorney, who resided in Ohio, and Statesman's president, who was a resident of New York. The only connection between the option agreement and Nebraska is negotiation and communication with non-party Horbach who, along with his five fellow Regency board members, voted in favor of the stock option agreement during a telephonic meeting on May 21, 1997.

As for the exercise of the option, Statesman notified Ponsoldt Sr. on December 3, 2000, of its intent to exercise the option and authorized Ponsoldt Sr. to notify the Regency Board of Directors of its intent. Ponsoldt notified the Board of this information during a December 3 and 4, 2000, meeting in Denver, Colorado. However, Statesman did not exercise its option until October 15, 2001, at which time Regency had no contacts with Nebraska. The negotiations leading up to the option exercise agreement were conducted by Regency's Board of Directors, none of whom were residents of Nebraska; Regency's attorney who resided in New Jersey; one of Regency's accountants who was a New Jersey resident; and Statesman's attorney, a resident of the Bahamas. (Filing 189, Ex. M, Decl. William Ponsoldt, Sr. ¶¶ 16–17.)

### 5. *Glas–Aire Acquisition & Divestiture*

In 1999, Regency acquired control of Glas–Aire, a Canadian corporation involved in the auto parts industry, in exchange for Regency common stock. On October 16, 2001, Ponsoldt directed Regency to divest Regency's controlling interest in Glas–Aire in exchange for 4,040,375 shares of Regency common stock then owned by Glas–Aire, plus $2.5 million in cash, of which at least $1.3 million was used to pay Ponsoldt for accrued compensation under his Employment Agreement. (Filing 157, Amended Complaint ¶¶ 38–39.) No communications relating to this transaction by, or on behalf of, Ponsoldt Sr.

took place in Nebraska. (Filing 189, Ex. M, Decl. William Ponsoldt, Sr. ¶ 18.)

### 6. Alleged Fraudulent Exercise of Option

After the divestiture of Glas–Aire, and contrary to Ponsoldt's representation that Statesman's option would not be exercised unless there was a hostile takeover, Statesman exercised its option to acquire 6.1 million shares of Regency stock in exchange for a promissory note to Regency for $2.44 million. This transaction reduced the plaintiffs' percentage of ownership interest from 89.1% to approximately 61.1%. (Filing 157, Amended Complaint ¶ 40.)

### 7. Reverse Split & Decrease of Par Value

Effective February 22, 2002, Regency adopted a 1–for–10 reverse stock split without proportionately reducing the number of authorized shares from 25 million to 2.5 million, thereby reducing the par value of Regency common stock from $.40 to $.01. (Filing 157, Amended Complaint ¶¶ 41–43.) Ponsoldt Sr. has testified that any connection between this transaction and the State of Nebraska is limited to two telephone calls he made to plaintiffs Gatz and Graham, Nebraska residents who were Regency shareholders. Ponsoldt Sr. contacted Gatz and Graham, who both held significant positions in Regency, to determine whether they would support a reverse stock split. (Filing 189, Ex. M, Decl. William Ponsoldt, Sr. ¶ 19.)

### 8. Recapitalization of Regency

Defendant Royalty made a $4,750,000 loan to Regency in exchange for a promissory note, part of which is convertible to approximately 59.31% of the outstanding shares of Regency common stock. Regency then redeemed 754,950 shares of Regency common stock owned by Statesman by making $4 million in cash payments to Statesman representing a redemption pay-

ment, a fee, and a Call Option Agreement granting Regency an option to purchase 20% of the outstanding shares of NRDC owned by Statesman. Regency also transferred to Statesman office equipment and furniture from Regency's Florida office and amended and restated Statesman's $2.44 million promissory note delivered to Regency in October 2001. (Filing 157, Amended Complaint ¶¶ 54–58.)

As part of this so-called recapitalization, the Regency Board of Directors resigned effective October 28, 2002, and was replaced by persons designated by Royalty, one of which was defendant Levy. On October 16, 2002, Levy and another board member replaced Ponsoldt and Baldinger as Regency's president/CEO and CFO/secretary respectively. (Filing 157, Amended Complaint ¶¶ 54–58.)

The documents constituting the recapitalization were signed at Regency's office in Florida on October 16, 2002, and the negotiations and due diligence regarding such transaction occurred in Florida and New York. The negotiations preceding the recapitalization took place in telephone conversations and face-to-face meetings between Laurence Levy and representatives of Regency, Ponsoldt, and Statesman Group, Inc. However, none of these meetings occurred in Nebraska, and none of telephone calls involved Nebraska participants. (Filing 187, Ex. A., Aff. Laurence Levy ¶ 13.)

### C. Plaintiffs' Claims and Defendants' Motions

The plaintiffs assert several claims against the following defendants: Count I, Violation of RICO (18 U.S.C. § 1962(b)), and Count II, Violation of RICO (18 U.S.C. § 1962(c)), against defendants Ponsoldt Sr. and Statesman; Count III, Breach of Fiduciary Duty, against defendants Ponsoldt Jr., Baldinger, Craffey, and Carey; Count

IV, Breach of Fiduciary Duty, against defendants Ponsoldt Sr. and Statesman; Count V, Declaratory Judgment, against defendants Ponsoldt Sr. and Statesman; Count VI, Knowing Participation in Breach of Fiduciary Duty, against defendants Royalty Holdings, L.L.C., Royalty Management, Inc., and Levy; Count VII, Fraudulent Conveyance, against defendants Royalty Holdings, L.L.C., Royalty Management, Inc., Levy, Ponsoldt Sr., and Statesman; and Count VIII, Conspiracy to Violate RICO, against defendants Royalty Holdings, L.L.C., Royalty Management, Inc., and Levy.

All of the defendants have moved to dismiss Plaintiffs' amended complaint (filing 157) for lack of personal jurisdiction and improper venue or, alternatively, to transfer venue.[4] (Filings 183 & 185.) For the reasons that follow, I shall grant in part and deny in part the defendants' motions.

## II. DISCUSSION

Plaintiffs claim that personal jurisdiction and proper venue exist by virtue of 18 U.S.C. § 1965(a), (b), and (d) and 28 U.S.C. § 1391(b) and (d). (Filing 157, Amended Complaint ¶ 5.) Although not explicitly stated in their amended complaint, the plaintiffs assert that personal jurisdiction exists as to the non-RICO defendants

·under Nebraska's long-arm statute, Neb. Rev.Stat. § 25–536 (Michie 1995). (Filing 200, Mem. Opp'n Defs.' Mot. Dismiss, at 16–22.)

### A. Personal Jurisdiction

#### 1. Claims Against Ponsoldt Sr., Statesman, Royalty Holdings, Royalty Management, and Levy

Personal jurisdiction for civil causes of action brought pursuant to RICO is conferred by 18 U.S.C. § 1965,[5] which authorizes nationwide service of process. Gregory P. Joseph, *Civil RICO: A Definitive Guide* 6 (American Bar Association, 2d ed.2000). Federal circuit courts differ on the interpretation and application of section 1965, and it does not appear that the Eighth Circuit Court of Appeals has had the opportunity to analyze section 1965 as it concerns personal jurisdiction. *Id.* at 7 (noting split in circuits regarding interpretation of § 1965).

However, the Eighth Circuit Court of Appeals has broadly addressed the question whether "personal jurisdiction may constitutionally be exercised over a defendant in a federal court only if there are sufficient contacts between that defendant and the state in which he or she is expected to appear." Answering in the negative, the court stated that "Congress has ... quite frequently exercised its authority to

---

**4.** The defendants have also filed motions pursuant to Fed.R.Civ.P. 12(b)(6) (filings 184 & 188). However, "[b]efore a district court can reach the merits of a dispute and enter legally binding orders, it must determine as a threshold matter whether it possesses personal jurisdiction over the defendants." *Falkirk Mining Co. v. Japan Steel Works, Ltd.,* 906 F.2d 369, 372 (8th Cir.1990).

**5.** Section 1965 provides in part:

(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under section 1964 [civil remedies for RICO violations] of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

. . . . .

(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

furnish federal district courts with the power to exert personal jurisdiction nationwide," and " 'nothing in the Constitution ... forbids Congress to enact that ... [a federal trial court] ... shall ... have the power to bring before it all the parties necessary to its decision.' " *In re Federal Fountain, Inc.*, 165 F.3d 600, 601–02 (8th Cir.1999) (en banc) (deciding that Fed. R. Bank. P. 7004(d) authorizing nationwide service of process was constitutional exercise of congressional authority) (quoting *United States v. Union Pacific R.R. Co.*, 98 U.S. 569, 604, 8 Otto 569, 25 L.Ed. 143 (1878)).

The *Federal Fountain* court found that because Fed. R. Bank. P. 7004(d)—which authorized nationwide service of process— was a constitutional exercise of congressional authority, and because the defendant was "concededly present in the territory of the United States, ... the courts of the United States may therefore legally exercise the authority to proceed to judgment against it ...." *In re Federal Fountain*, 165 F.3d at 602. In other words, the court held that if a federal statute authorizes nationwide service of process, no further "contacts" analysis is necessary to determine whether the exercise of personal jurisdiction is compatible with due process as long as the defendants have sufficient minimum contacts with the United States. *See also United Power Ass'n. Inc. v. L.K. Comstock & Co.*, 1992 WL 402906, at *2–4 (D.Minn. Oct.27, 1992) (18 U.S.C. § 1965 creates nationwide personal jurisdiction under RICO, and exercise of such jurisdiction is constitutional when defendants have minimum contacts with the United States); *Starks v. Rent-A-Center*, 1994 WL 577974, at *8 (D.Minn. May 16, 1990) (RICO personal jurisdiction is nationwide under 18 U.S.C. § 1965; court can exercise such jurisdiction over RICO participants and co-conspirators if they have minimum contacts with the United

States); *Hirt v. UM Leasing Corp.*, 614 F.Supp. 1066, 1069–70 (D.Neb.1985) (Beam, D.J.) (minimum contacts analysis not relevant where federal statute like 18 U.S.C. § 1965 provides for nationwide service of process; in such cases, court's jurisdiction is coextensive with United States boundaries and due process requires only that defendant have minimum contacts with the United States, which is the sovereign that created the federal court).

The Eighth Circuit Court of Appeals has specifically rejected the view of other circuit courts that hold that "the constitutionality of the application of statutes granting nationwide jurisdiction to federal courts depends on whether the proposed forum puts a defendant at a 'severe disadvantage,' in defending the action and, if so, whether something called the 'federal interest' in litigating the matter in that forum outweighs attendant inconveniences to a defendant." *In re Federal Fountain*, 165 F.3d at 602 (citing and quoting *Republic of Panama v. BCCI Holdings, S.A.*, 119 F.3d 935, 948 (11th Cir.1997), a civil RICO case addressing personal jurisdiction under the nationwide-service-of-process provision of 18 U.S.C. § 1965).

Plaintiffs in this case bring four RICO claims: Count I, Violation of RICO (18 U.S.C. § 1962(b)), Count II, Violation of RICO (18 U.S.C. § 1962(c)), and Count V, Declaratory Judgment as to RICO violations, against defendants Ponsoldt Sr. and Statesman; and Count VIII, Conspiracy to Violate RICO, against defendants Royalty Holdings, Royalty Management, and Levy. It is clear that each of these defendants has sufficient contacts with the United States to support this court's exercise of personal jurisdiction over them pursuant to 18 U.S.C. § 1965 insofar as the RICO claims are concerned. Defendant Ponsoldt Sr. dominated the affairs of Regency, a United States corporation, during the time period involved in this lawsuit.

Defendant Statesman—although a Bahamian corporation with its principal place of business in Nassau, the Bahamas—owns Regency stock and was formed for the purpose of investing in the United States on behalf of Statesman Trust, an irrevocable trust settled by defendant Ponsoldt Sr. Defendants Royalty Holdings and Royalty Management are Delaware companies with principal places of business in New York. Finally, defendant Levy is a New York resident and the current Regency President, CEO, and Chairman of the Board.

■ The plaintiffs also assert state-law claims against these same defendants: Count IV, Breach of Fiduciary Duty, Count V, Declaratory Judgment related to breach of fiduciary duty, and Count VII, Fraudulent Conveyance, against defendants Ponsoldt Sr. and Statesman; and Count VI, Knowing Participation in Breach of Fiduciary Duty, and Count VII, Fraudulent Conveyance, against defendants Royalty Holdings, Royalty Management, and Levy. Because this court has personal jurisdiction over the RICO defendants pursuant to 18 U.S.C. § 1965 and because both the RICO claims and the state-law claims are based on the same nucleus of facts—that is, an ongoing fraudulent scheme to dilute the cash value and voting rights of the plaintiffs—this court also has personal jurisdiction over defendants Ponsoldt Sr., Statesman, Royalty Holdings, Royalty Management, and Levy as to the state-law claims asserted against them. *Robinson Engineering Co., Ltd. Pension Plan Trust v. George*, 223 F.3d 445, 449–50 (7th Cir.2000) (recognizing pendent personal jurisdiction in RICO

case); *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 627–29 (4th Cir.1997) (since court had personal jurisdiction over defendants under RICO, there was no constitutional bar to requiring defendants to defend both federal and state claims arising from same nucleus of facts, so long as the RICO claims were not wholly immaterial or insubstantial), *cert. denied*, 523 U.S. 1048, 118 S.Ct. 1364, 140 L.Ed.2d 513 (1998); *Hirt v. UM Leasing Corp.*, 614 F.Supp. 1066, 1070 (D.Neb.1985) (Beam, D.J.) (in RICO case where state claims arose from same set of operative facts that supported RICO claim, court necessarily had personal jurisdiction over state claims).

Accordingly, this court may exercise personal jurisdiction over defendants Ponsoldt Sr., Statesman, Royalty Holdings, Royalty Management, and Levy.

### 2. Claim Against Ponsoldt Jr., Baldinger, Craffey, and Carey

■ The plaintiffs assert one state-law claim against defendants Ponsoldt Jr., Baldinger, Craffey, and Carey—Count III, Breach of Fiduciary Duty. The plaintiffs allege that these defendants, as directors of Regency, acted recklessly or with gross negligence in 2001 when they allowed Ponsoldt Sr. and Statesman to "implement their scheme to loot Regency ... and to allow the recapitalization transaction announced October 17, 2002." (Filing 157, Amended Complaint ¶ 70.) The plaintiffs argue that this court may exercise personal jurisdiction over these defendants under Nebraska's long-arm statute, Neb.Rev. Stat. § 25–536.[6]

---

**6.** The Nebraska long-arm statute provides:

A court may exercise personal jurisdiction over a person:

(1) Who acts directly or by an agent, as to a cause of action arising from the person:

(a) Transacting any business in this state;

(b) Contracting to supply services or things in this state;

(c) Causing tortious injury by an act or omission in this state;

(d) Causing tortious injury in this state by an act or omission outside this state if the person regularly does or solicits business,

In order to survive the defendants' motion to dismiss for lack of personal jurisdiction, the plaintiffs need only make a prima facie showing of personal jurisdiction over defendants Ponsoldt Jr., Baldinger, Craffey, and Carey. *Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996). Further, this court must view the evidence in the light most favorable to the plaintiffs and must resolve all factual conflicts in their favor. *Id.*

In determining whether this court has personal jurisdiction over a nonresident defendant, we must ask (1) whether the Nebraska long-arm statute is satisfied, and (2) whether the exercise of jurisdiction over this defendant will violate the Due Process Clause of the Fourteenth Amendment. *Minnesota Mining & Mfg. Co. v. Nippon Carbide Indus. Co., Inc.*, 63 F.3d 694, 696–97 (8th Cir.1995), *cert. denied*, 516 U.S. 1184, 116 S.Ct. 1288, 134 L.Ed.2d 232 (1996). Nebraska's long-arm statute, Neb. Rev.Stat. § 25–536, has been interpreted to extend jurisdiction over nonresident defendants to the fullest degree allowed by the Due Process Clause of the United States Constitution. *Wagner v. Unicord Corp.*, 247 Neb. 217, 221, 526 N.W.2d 74, 77 (1995). Thus, constitutional limits will dictate whether jurisdiction over Ponsoldt Jr., Baldinger, Craffey, and Carey is proper.

In order to exercise personal jurisdiction over a nonresident defendant, due process requires that such defendant have "minimum contacts" with the forum state such that maintenance of a suit against that defendant does not offend " 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). The nonresident defendant's conduct and connection with the forum state must be such that "he should reasonably anticipate being haled into court there," *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), and it is essential that " 'there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). "Purposeful availment" means that the defendant's contacts with the forum state must not be random, fortuitous, attenuated, or the result of unilateral activity of a third person or another party. *Id.*

Once it has been determined that the nonresident defendant purposefully established minimum contacts with the forum state, such contacts must be analyzed in light of other factors to determine whether the exercise of personal jurisdiction over the nonresident defendant comports with "fair play and substantial justice." *Id.* at 476, 105 S.Ct. 2174. The factors, as articulated by the Eighth Circuit Court of Appeals, are: "(1) the nature and quality of

engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state;

(e) Having an interest in, using, or possessing real property in this state; or

(f) Contracting to insure any person, property, or risk located within this state at the time of contracting; or

(2) Who has any other contact with or maintains any other relation to this state to afford a basis for the exercise of personal jurisdiction consistent with the Constitution of the United States.

Neb.Rev.Stat. § 25–536 (Michie 1995).

contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." *Burlington Indus., Inc. v. Maples Indus., Inc.,* 97 F.3d 1100, 1102 (8th Cir.1996). The fourth and fifth factors are of secondary importance and are not determinative. *Land–O–Nod Co. v. Bassett Furniture Indus., Inc.,* 708 F.2d 1338, 1340 (8th Cir.1983). In applying these factors, the central inquiry is the "'relationship among the defendant, the forum, and the litigation.'" *Id.* (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)).

■ It is the third element of the above test—the relationship between the cause of action and the contacts—which gives rise to the distinction between specific and general jurisdiction. Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within a forum state, while general jurisdiction refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose. *Bell Paper Box, Inc. v. U.S. Kids, Inc.,* 22 F.3d 816, 819 (8th Cir.1994) (citing *Sondergard v. Miles, Inc.,* 985 F.2d 1389, 1392 (8th Cir.), *cert. denied,* 510 U.S. 814, 114 S.Ct. 63, 126 L.Ed.2d 32 (1993)).

■ If specific jurisdiction is asserted, "due process is satisfied if the defendant has purposely directed its activities at forum residents, and the litigation results from injuries arising out of, or relating to, those activities." *Burlington Indus., Inc.,* 97 F.3d at 1103. Physical presence in the state or physical contacts with the state are not a necessary component of "minimum contacts." *U.S. Kids,* 22 F.3d at 820 (citing *Burger King v. Rudzewicz,* 471 U.S. at 476, 105 S.Ct. 2174). In contrast, general personal jurisdiction allows a defendant whose contacts with a forum are "continuous and systematic" to be sued in the forum on any basis. *Morris v. Barkbuster, Inc.,* 923 F.2d 1277, 1280–81 (8th Cir.1991); *Gray v. Lewis & Clark Expeditions, Inc.,* 12 F.Supp.2d 993, 996–97 (D.Neb.1998).

The plaintiffs allege that defendants Ponsoldt Jr., Baldinger, Craffey, and Carey, as directors of Regency, breached their fiduciary duties in 2001 when they allowed Ponsoldt Sr. and Statesman to implement their scheme to "loot" Regency and to allow the recapitalization transaction that was announced on October 17, 2002. As detailed in the "Background" section of this Memorandum and Order, at the time these defendants allegedly breached their fiduciary duties, Regency had been maintaining its principal place of business in Florida for at least five years, and Regency's administrative office—which was located in Omaha, Nebraska, from 1992 to December 2000—was no longer in Omaha. Further, Regency's Omaha, Nebraska, checking accounts from which the defendants received quarterly retainers and fees for attending out-of-state board meetings were no longer located in Omaha after January 2001.

Ponsoldt Jr., Baldinger, Craffey, and Carey have never resided in Nebraska, owned or rented property in Nebraska, had any personal property in Nebraska, maintained bank accounts in Nebraska, or voted or filed tax returns in Nebraska. Defendants Baldinger, Craffey, and Carey visited Nebraska once for an August 5, 1999, Regency shareholders meeting and Ponsoldt Jr. visited Nebraska once in December 2000 to procure from a former Regency director documents that are unrelated to the claims against Ponsoldt Jr. in this case. While Regency's administrative office was located in Nebraska, Ponsoldt Jr., Baldinger, Craffey, and Carey were among the board members who communi-

cated with Regency's corporate secretary by telephone and facsimile about general business-related matters such as financing, stocks, expense reports, and board meetings.

Even assuming Nebraska's long-arm statute would provide a threshold basis for exercising personal jurisdiction over Ponsoldt Jr., Baldinger, Craffey, and Carey, these defendants' limited contacts with Nebraska do not satisfy the Due Process Clause under either a specific or general jurisdiction theory. These defendants' one visit to Nebraska in 1999 (Baldinger, Craffey, and Carey) and 2000 (Ponsoldt Jr.); general business-related telephone calls to Regency's administrative office in Nebraska; and possible retainer payments from a Nebraska checking account simply do not establish that the defendants purposely directed their activities at Nebraska residents; that the claim asserted against the defendants in this litigation—breach of fiduciary duty sometime in 2001—resulted from injuries arising out of, or relating to, their limited contacts with Nebraska; or that their contacts with Nebraska were continuous and systematic in any way. *Helicopteros Nacionales De Colombia, S.A. v. Hall,* 466 U.S. 408, 416–17, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (foreign corporation's acceptance of checks drawn on Texas bank not appropriate consideration when determining whether corporation had sufficient contacts with Texas to justify assertion of jurisdiction; "[A]bsent unusual circumstances, the bank on which a check is drawn is generally of little consequence to the payee and is a matter left

to the discretion of the drawer."); *Sybaritic, Inc. v. Interport Int'l, Inc.,* 957 F.2d 522 (8th Cir.1992) (defendant in contract action not subject to personal jurisdiction in Minnesota when defendant's principal made two-day visit to Minnesota followed by telephone and mail communications, but the agreement was negotiated, drafted, presented, and executed in Japan); *Barkbuster,* 923 F.2d 1277 (Minnesota court did not have long-arm jurisdiction over Ohio corporation with principal place of business in Arizona in product liability action stemming from plaintiff's injury in Kentucky, even though manufacturer sold its product to Minnesota company whose employees made three trips to Minnesota in connection with such sale); *Bell Paper Box, Inc. v. Trans Western Polymers, Inc.,* 53 F.3d 920, 923 (8th Cir.1995) ("The use of interstate facilities, such as telephones or mail, is a secondary or ancillary factor and cannot alone provide the minimum contacts required by due process." (internal quotation marks omitted)).

Accordingly, this court may exercise neither general nor specific jurisdiction over defendants Ponsoldt Jr., Baldinger, Craffey, and Carey.

## B. Venue

### 1. RICO Venue

■ The plaintiffs claim that the District of Nebraska is the proper venue for their causes of action[7] pursuant to RICO, 18 U.S.C. §§ 1965(a) and (b), and pursuant to the general venue statute, 28 U.S.C. §§ 1391(b) and (d).[8]

---

**7.** Because I have determined that this court may not exercise personal jurisdiction over defendants Ponsoldt Jr., Baldinger, Craffey, and Carey, I need not analyze proper venue as it concerns these defendants.

**8.** Section 1391 provides in part:

. . . . .

(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may,

except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found,

Section 1965(a) of RICO provides that "[a]ny civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs." The amended complaint and the evidence submitted in connection with the defendants' motions to dismiss do not establish that any of the RICO defendants reside in Nebraska, may be found in Nebraska, or have an agent in Nebraska.

The "transacts his affairs" language in section 1965(a) has been interpreted to mean that the defendants "regularly transact business of a substantial and continuous character within the district." Gregory P. Joseph, *Civil RICO: A Definitive Guide* 22 (American Bar Association, 2d ed.2000); *Caldwell v. Palmetto State Savings Bank*, 811 F.2d 916, 918 (5th Cir. 1987) (§ 1965(a) requires "that a defendant be conducting business in the forum"); *Abeloff v. Barth*, 119 F.R.D. 315, 328 (D.Mass.1988) (corporate defendant "transacts ... affairs" under § 1965(a) if it regularly carries on business of a substantial and continuous character within the district); *Dody v. Brown*, 659 F.Supp. 541, 545–46 (W.D.Mo.1987) (plaintiffs must prove defendants "have regularly engaged in some significant and substantial activities in the [forum] in order to show that venue is proper under § 1965(a)"); *Miller Brewing Co. v. Landau*, 616 F.Supp. 1285, 1288 (E.D.Wis.1985) ("transacted his affairs" under § 1965(a) means "he has regularly conducted business of a substantial and continuous character within that district").

Again, neither the allegations contained in the amended complaint nor the affida-vits submitted by the parties establish that RICO defendants Ponsoldt Sr., Statesman, Royalty Holdings, Royalty Management, or Levy regularly engage—or engaged in the past—in significant, substantial, and continuous business in Nebraska. With the possible exception of the Acquisition Agreement activities in June and July of 1993, none of the transactions comprising these defendants' alleged fraudulent scheme occurred in Nebraska and Regency's principal place of business was not located in Nebraska during those transactions. The fact that Regency's administrative office was located in Nebraska during a portion of these transactions is insufficient to satisfy section 1965(a) when the evidence establishes that the office performed purely general administrative business functions for Regency on a contract basis, and when there is little apparent connection—much less a significant, substantial, and continuous business relationship—between these particular defendants and Nebraska. Thus, venue in Nebraska is improper for Plaintiffs' claims under 18 U.S.C. § 1965(a).

### 2. *Venue Under 28 U.S.C. § 1391*

Alternatively, the plaintiffs argue that venue is proper as to RICO defendant Levy under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the [RICO conspiracy] claim occurred" in Nebraska. The plaintiffs state that on August 29, 2002, Levy (in New York) sent a letter to Ponsoldt (in Florida) complaining that this Nebraska litigation was interfering with Levy's plan to acquire a controlling equity interest in Regency and stating that the transaction could not be completed until this litigation

---

if there is no district in which the action may otherwise be brought.

. . . . .

(d) An alien may be sued in any district.

is closed (Filing 157, Amended Complaint, Ex. C). The plaintiffs assert that Levy's letter lulled them into "a false sense of security," causing them to agree to postpone their motion for preliminary injunction and enabling the defendants to proceed with a "surprise capitalization that paid $4 million to Defendant Statesman to the detriment of Plaintiffs and gave the Royalty Defendants the right to further dilute the interest of Plaintiffs and the putative class." This, say the plaintiffs, is a major part of their RICO conspiracy claim against Levy, and therefore constitutes a substantial act that gives rise to venue in Nebraska. (Mem. Opp'n Royalty Defs.' Mot. to Dismiss, at 5–6.)

The undisputed evidence establishes that defendant Levy sent the letter not to Nebraska, but to Ponsoldt Sr. at his Florida address; the documents constituting the recapitalization were signed at Regency's office in Florida on or about October 16, 2002; the negotiations and due diligence preceding the transaction occurred in Florida and New York; and no part of these negotiations took place in Nebraska or by persons in Nebraska—instead, they occurred by telephone and in personal meetings involving Levy and representatives of Regency, Ponsoldt Sr., and Statesman. (Filing 187, Aff. Laurence Levy ¶¶ 13–14.) Under these circumstances, I am not persuaded by Plaintiffs' argument that Nebraska is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b).

The plaintiffs also claim that venue is proper against defendant Statesman pursuant to 28 U.S.C. § 1391(d). Because section 1391(d) allows aliens to be sued in any judicial district and Statesman is a Bahamian corporation with its principal

place of business in Nassau, the Bahamas, it may be sued in any district, including the District of Nebraska.[9] However, as explained below, the fact that venue is proper in this court as to Statesman alone pursuant to section 1391(d) does not remedy Plaintiffs' venue problem.

### 3. RICO Venue Revisited

Section 1965(b) provides:

(b) In any action under section 1964 [civil remedies for RICO violations] of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

This section may be used to gain proper venue over nonresident defendants "only if venue in the district is appropriate as to at least one defendant pursuant either to section 1965(a) or the general venue statute, 28 U.S.C. § 1391." *Civil RICO: A Definitive Guide* 22. Having already decided that venue in Nebraska is improper for Plaintiffs' claims under 18 U.S.C. § 1965(a), and that venue under the general venue statute is proper in Nebraska only as to defendant Statesman pursuant to 28 U.S.C. § 1391(d) (providing that alien may be sued in any district), the question is whether RICO venue over all defendants pursuant to section 1965(b) can be achieved solely by finding proper venue as to one defendant under section 1391*(d)* (emphasis added).

The parties have not cited, nor has the court found, any federal case answering

9. The plaintiffs do not claim, nor does the court find, proper venue for any other defendant under section 1391.

this question in the positive. To the contrary, those cases discussing venue under section 1391 as a means of gaining RICO venue over other defendants in a multi-defendant RICO case pursuant to section 1965(b) rely only upon 28 U.S.C. § 1391*(b)* (emphasis added), which provides:

(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

*See, e.g., Lisak v. Mercantile Bancorp, Inc.,* 834 F.2d 668, 672 (7th Cir.1987) (proper venue under 28 U.S.C. § 1391(b) also makes venue proper under 18 U.S.C. § 1965(b) when interests of justice require) (dicta to guide district court's reconsideration of venue issue on remand), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 700 (1988); *APS, LLC v. Facility Pharmacy Corp.,* 2000 WL 33976531, at *2–3 (W.D.Ky. Mar.9, 2000) (in order to invoke venue provision in § 1965(b), plaintiff must show proper venue as to at least one defendant under 29 U.S.C. § 1391(b) and that ends of justice require bringing in the remaining defendants); *Kaplan v. Reed,* 28 F.Supp.2d 1191, 1203 (D.Colo. 1998) (if venue proper as to some defendants under § 1391(b), court must decide whether ends of justice require other defendants to defend in same forum under section 1965(b)).

In the absence of authority sanctioning the use of 28 U.S.C. § 1391(d) (as opposed to section 1391(b)) as a means to gain proper venue over all defendants in a mul-

ti-defendant RICO case under 18 U.S.C. § 1965(b), I reject the plaintiffs' argument that the mere fact that Statesman is an alien and can be sued in any judicial district pursuant to section 1391(d) also makes Nebraska a proper venue for the remaining defendants pursuant to 18 U.S.C. § 1965(b). This is especially so since "[o]ne of the central purposes of statutory venue is to ensure that a defendant is not haled into a remote district having no real relationship to the dispute." *Woodke v. Dahm,* 70 F.3d 983, 985 (8th Cir.1995) (internal quotation marks and citation omitted). As repeatedly described above, there is very little relationship between Plaintiffs' claims and Nebraska, other than the fact that Plaintiffs live here, which is an insufficient basis to support venue over the widely-dispersed defendants. *Id.* (rejecting plaintiff's argument that venue existed in Northern District of Iowa simply because plaintiff resided there when claim arose).

Therefore, the fact that Nebraska is a proper venue for Plaintiffs' claims against Statesman pursuant to 28 U.S.C. § 1391(d) does not create proper venue for Plaintiffs' claims against the remaining defendants under 18 U.S.C. § 1965(b).

### C. Motions to Transfer

 Because venue in this district is improper, the defendants move to transfer this case to Delaware pursuant to 28 U.S.C. § 1406(a), which provides:

The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

In the interest of justice, I shall not dismiss this matter, but instead transfer it to Delaware, where this case could have been brought originally.

Regency, Royalty Holdings, and Royalty Management are all Delaware corporations whose officers and directors—defendants Ponsoldt Sr., Ponsoldt Jr., Baldinger, Craffey, Carey, and Levy—have statutorily submitted themselves to jurisdiction in Delaware for legal actions against them based on breach of the fiduciary duties owed to their corporations and their corporations' owners. Del.Code Ann. tit. 10, § 3114 (2002); *E.M. Armstrong v. Pomerance*, 423 A.2d 174, 177 (Del.1980) ("Delaware does have a significant and substantial interest in actively overseeing the conduct of those owing fiduciary duties to shareholders of Delaware corporations and that such interest far outweighs any burden to defendants, who have voluntarily associated themselves with such corporations by accepting directorships, in being required to submit to the jurisdiction of our courts."); *Carlton Investments v. TLC Beatrice Int'l Holdings*, 1996 WL 608492, at *4–5 (Del.Ch. Oct.16, 1996) (section 3114, Delaware's director consent statute, puts corporate directors on notice that if they are charged with violation of fiduciary duties owed to corporation or its owners, they might be subject to adjudication in Delaware; by accepting position as director of Delaware corporations, director impliedly consented to service of process; section 3114 "recognizes the strong interest that [Delaware courts have] in assuring the effective administration of the law governing corporations organized in Delaware and, therefore, in hearing cases regarding internal corporate governance issues."); *Tabas v. Crosby*, 444 A.2d 250, 254 (Del.Ch.1982) (section 3114, which is a non-resident director's implied consent statute, protects Delaware's viable interest in securing jurisdiction over its corporate fiduciaries).

Further, defendants Statesman and Levy have agreed to the exercise of personal jurisdiction over them in Delaware, and the District of Delaware presumably would have personal jurisdiction over the RICO defendants, as the District of Nebraska would. (Filing 212, Reply Br. Instanter Supp. Joint Mot. Royalty Defs. to Dismiss, at 12) ("Levy has submitted himself to Delaware's jurisdiction."); Filing 185, Defs.' Mem. Supp. Joint Mot. Dismiss, at 19 n. 10 ("While Statesman was not a director of any Delaware corporation, Statesman consents to personal jurisdiction there.") *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703–05, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (parties can consent to the exercise of personal jurisdiction by a particular court).

Venue is also proper in the District of Delaware as to each defendant. Statesman and Carey, as aliens, may be haled into any district, including the District of Delaware. 28 U.S.C. § 1391(d). Defendants Royalty Holdings and Royalty Management are corporations organized under the laws of Delaware, and therefore "reside" and may be "found" in the District of Delaware. 18 U.S.C. § 1965(a) (suit may be brought under RICO against any person "in the district court ... for any district in which such person resides, is found, has an agent, or transacts his affairs"). As directors of Delaware corporations, defendants Ponsoldt Sr. and Levy are deemed to have registered agents in Delaware and, therefore, venue is proper in Delaware as to them. Del.Code Ann. tit. 10, § 3114; 18 U.S.C. § 1965(a). Finally, defendants Ponsoldt Jr., Baldinger, and Craffey may be haled into the District of Delaware under 28 U.S.C. § 1391(b)(3), which provides for venue in any "judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought."

In order to cure the lack of proper venue for Plaintiffs' claims in this court, and because this case originally could have been brought in Delaware, I shall grant the defendants' motions to transfer this case to the District of Delaware pursuant to 28 U.S.C. § 1406(a). A federal district court may transfer a case pursuant to section 1406(a), despite the fact that it lacks personal jurisdiction over some of the defendants, as in this case. 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3827, at 263 (2d ed.1986) (§ 1406 broad enough to allow transfer whether court in which case was filed had personal jurisdiction over defendants or not); *Quality Improvement Consultants, Inc. v. Williams*, 2003 WL 543393, at *9 (D.Minn. Feb.24, 2003) (same; citing *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962)); *Drayton Enterprises, L.L.C. v. Dunker*, 142 F.Supp.2d 1177, 1186 (D.N.D.2001) (same; denying motion to dismiss for lack of personal jurisdiction although court lacked personal jurisdiction over defendants and instead ordering transfer pursuant to § 1406); *Uncle Sam's Safari Outfitters, Inc. v. Uncle Sam's Army Navy Outfitters–Manhattan, Inc.*, 96 F.Supp.2d 919 (E.D.Mo.2000) (although court lacked personal jurisdiction over defendants, motion to dismiss denied without prejudice and case transferred pursuant to § 1406). Accordingly, I shall also deny without prejudice the defendants' motions to dismiss for lack of personal jurisdiction and improper venue.

### III. CONCLUSION

While this court may exercise personal jurisdiction over the RICO defendants (Ponsoldt Sr., Statesman, Royalty Holdings, L.L.C., Royalty Management, Inc., and Levy) in connection with Plaintiffs' RICO and state-law claims, venue in the District of Nebraska is improper. Because this matter originally could have

originally been brought in the District of Delaware, and in order to remedy the lack of proper venue, I shall grant the defendants' motions to transfer this case to the District of Delaware pursuant to 28 U.S.C. § 1406(a).

Because this matter will be transferred out the District of Nebraska, the remaining motions still pending before this court—the defendants' motions to dismiss for failure to state a claim under Fed. R.Civ.P. 12(b)(6) and the plaintiffs' motion for preliminary injunction—shall be denied as moot without prejudice to their reassertion in the United States District Court for the District of Delaware. (Filings 184, 188, 218.)

IT IS ORDERED:

1. The defendants' motions to transfer this case to the United States District Court for the District of Delaware pursuant to 28 U.S.C. § 1406(a) (filings 183 & 185) are granted.

2. The defendants' motions to dismiss for lack of personal jurisdiction and improper venue (filings 183 & 185) are denied without prejudice.

3. The defendants' motions to dismiss for failure to state a claim under Fed. R.Civ.P. 12(b)(6) (filings 184 & 188) are denied as moot without prejudice to their reassertion in the United States District Court for the District of Delaware.

4. The motion for preliminary injunction filed by Plaintiffs (filing 218) is denied as moot without prejudice to its reassertion in the United States District Court for the District of Delaware.

5. The hearing on Plaintiffs' motion for preliminary injunction, set for July 21, 2003, is cancelled.

6. The Clerk of the United States District Court for the District of Nebras-

ka shall transfer this case to the United States District Court for the District of Delaware pursuant to 28 U.S.C. § 1406(a). Upon completing such transfer, the Clerk of Court shall close this case.